USCA1 Opinion

 

 October 28, 1994 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1171 JOSE L. SANCHEZ, Plaintiff, Appellee, v. PUERTO RICO OIL COMPANY, Defendant, Appellant. _________________________ ERRATA SHEET ERRATA SHEET The opinion of the court issued on September 29, 1994, is corrected as follows: 1. After first sentence of footnote 3, (p.5), delete remainder of footnote and replace with the following: Plaintiff conceded at trial, however, that appellant's general manager, George Gonzalez, had reprimanded him on approximately four occasions in the 1988-1990 time frame. The significance of these reprimands to plaintiff's overall job performance involved a fact determination within the jury's exclusive province. 2. On p.7, delete last sentence of first paragraph and replace with the following: Appellant disputed plaintiff's version of this conversation, suggesting that any remarks by Gonzalez were motivated solely by a concern for plaintiff's health and physical condition. 3. On p.15, delete last two sentences of first paragraph and replace with the following: Last, but surely not least, after having refused to reinstate Sanchez, Gonzalez questioned him about his age and made other age-related remarks that the jury reasonably could have construed as evincing bias. Indeed, if the jury credited plaintiff's version of this conversation as it had a right to do, especially since Gonzalez, though available, was never called to testify at trial Gonzalez's statements comprise potent evidence of age-based animus. UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT _________________________ No. 94-1171 JOSE L. SANCHEZ, Plaintiff, Appellee, v. PUERTO RICO OIL COMPANY, Defendant, Appellant. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Jose Antonio Fuste, U.S. District Judge] ___________________ _________________________ Before Selya, Boudin and Stahl, Circuit Judges. ______________ _________________________ Enrique Velez-Rodriguez, with whom Lespier & Munoz-Noya was _______________________ ____________________ on brief, for appellant. Federico Lora Lopez for appellee. ___________________ _________________________ September 29, 1994 _________________________ SELYA, Circuit Judge. This is a ghost ship of an SELYA, Circuit Judge. ______________ appeal. One hears the creak of the rigging, the groan of the timber, and the muted sound of voices through the fog but there is nothing solid to be grasped. In the end the appeal, like the ghost ship, vanishes into the mist, leaving things exactly as they were. The tale follows. I. AN OVERVIEW I. AN OVERVIEW Plaintiff-appellee Jose L. Sanchez sued defendant- appellant Puerto Rico Oil Company (Proico) asserting that the company constructively discharged him due to his advanced age. A jury agreed; it found that Proico had willfully violated both the Age Discrimination in Employment Act, 29 U.S.C. 621 634 (1988) (ADEA), and a Puerto Rico statute proscribing employment discrimination, P.R. Laws Ann. tit. 29, 146 (Supp. 1989) (Law 100). The jury awarded Sanchez $40,376.80 in backpay under ADEA and $150,000 for mental and moral suffering under Law 100.1 Proico moved for judgment notwithstanding the verdict, Fed. R. Civ. P. 50(b), or for a new trial, Fed. R. Civ. P. 59(a). The district court reduced the damage awards to $38,000 for backpay and $37,500 for suffering, but otherwise gave Proico cold gruel. The court then doubled the reduced awards, bringing Proico's aggregate liability to $151,000. This appeal ensued. Although appellant aggressively advances an armada of  ____________________ 1In both the jury instructions and the verdict form, the district court appropriately precluded the jury from awarding damages for backpay under Law 100 in the event that it awarded such damages under the ADEA. 4 artful arguments, only five are worthy of extended comment.2 These include four evidence-oriented propositions, namely, that the evidence (1) failed to establish a prima facie case, (2) did not warrant a finding of liability on the ADEA count, (3) fell short of showing willfulness, and (4) did not warrant a finding that plaintiff sustained non-economic damages in the amount awarded under Law 100. Appellant's final claim is that the lower court erred in doubling the two awards. Because these importunings do not withstand close perscrutation, we affirm the judgment below. II. THE ADEA CLAIM II. THE ADEA CLAIM Since the first three components of appellant's asseverational array challenge the adequacy of the evidence in respect to various aspects of plaintiff's ADEA claim, we treat them in the ensemble. A. Standards of Review. A. Standards of Review. ___________________ The standards of review that appertain to a trial court's denial of the usual post-trial motions in civil cases are firmly settled. With respect to a motion for judgment n.o.v., now known as judgment as a matter of law, the court of appeals must examine the evidence and the inferences reasonably to be extracted therefrom in the light most hospitable to the  ____________________ 2On appeal, Proico offers no developed argumentation concerning any alleged insufficiency of the evidence vis-a-vis the jury's finding of liability on the Law 100 claim. Thus, we treat any such claim as abandoned. See, e.g., Ryan v. Royal Ins. ___ ____ ____ __________ Co., 916 F.2d 731, 734 (1st Cir. 1990); United States v. Zannino, ___ _____________ _______ 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990). _____ ______ 5 nonmovant, and may reverse the denial of such a motion only if reasonable persons could not have reached the conclusion that the jury embraced. See Wagenmann v. Adams, 829 F.2d 196, 200 (1st ___ _________ _____ Cir. 1987). In performing this tamisage, "we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." Id. ___ Appellate review of a district court's disposition of a Rule 59(a) motion is even more circumscribed; a district court may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice. See ___ Coffran v. Hitchock Clinic, Inc., 683 F.2d 5, 6 (1st Cir.), cert. _______ _____________________ _____ denied, 459 U.S. 1087 (1982). And, moreover, a trial judge's ______ refusal to disturb a jury verdict is further insulated because it can be reversed solely for abuse of discretion. See Freeman v. ___ _______ Package Mach. Co., 865 F.2d 1331, 1334 (1st Cir. 1988); Milone v. _________________ ______ Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988). ___________________ Mindful of the high hurdles that obstruct appellant's path, we evaluate the evidence referable to the ADEA count with an eye toward determining whether it can support only one outcome, or, if not, whether it is so one-sided that the trial court's failure to defenestrate the verdict constituted an abuse of discretion. If neither of these conditions obtain, we cannot disturb the lower court's disposition of appellant's post-trial motions. B. The Proof. B. The Proof. _________ 6 Plaintiff worked for appellant in various capacities for approximately two decades. During the first 18 years, he performed satisfactorily, spending most of his time maintaining the company's inventory system. In 1988, appellant reassigned plaintiff, then 67 years old, to man a sales counter at appellant's place of business in San Juan. Plaintiff concedes that this reclassification reflected a legitimate change in business conditions. Though the evidence is largely disputed from this point forward, plaintiff contends, and the jury could warrantably have found, that he continued to perform his duties ably.3 In May of 1990, however, managerial changes occurred. Manuel Catinchi became the company's executive vice-president. Plaintiff asserts that Catinchi soon embarked on a course of age-animated harassment. The pot began to boil when Catinchi summoned plaintiff on July 5 and August 1, and criticized his job performance. A jury reasonably could have concluded from all the evidence that Catinchi had an ulterior motive in calling the meetings; contrary to Catinchi's testimony that the sessions were sparked by customer complaints that had been reported to Soto and relayed by him to Catinchi, Soto denied having received any such  ____________________ 3At trial, this boast was substantiated by the testimony of both plaintiff's immediate supervisor, Mr. Soto, and a co-worker, Nydia Candelaria. Plaintiff conceded at trial, however, that appellant's general manager, George Gonzalez, had reprimanded him on approximately four occasions in the 1988-1990 time frame. The significance of these reprimands to plaintiff's overall job performance involved a fact determination within the jury's exclusive province. 7 complaints. In fact, Soto testified, he had never spoken with Catinchi concerning plaintiff's job performance. Soto added that plaintiff's work was exemplary. On August 23, 1990, Catinchi wrote to plaintiff informing him that he was being "promoted" to head a new office in Aguadilla, effective September 1. Appellant asserts that this promotion demonstrates its lack of animosity toward Sanchez. But a jury feasibly could have viewed the employment decision in a more sinister light; after all, Aguadilla is located in the westernmost part of Puerto Rico, a three-hour drive from plaintiff's home; and at any rate, management knew that plaintiff did not own a car and that his wife suffered from a disability that made it unwise (if not impossible) for him to spend additional time away from home. The company did not offer to relocate plaintiff or to furnish him transportation, and the modest pay increase that was to accompany the promotion was not enough to defray the costs associated with commuting.4 The record is tenebrous as to whether appellant presented the promotion to plaintiff as obligatory or optional. For present purposes, we do not think it matters, for, on August 29, plaintiff wrote to Catinchi declining reassignment. His letter stated that he had "reached the conclusion that all this has a name and a purpose: harassment and age discrimination to force me to resign . . . ." The company neither responded to  ____________________ 4The evidence also established that appellant did not have an office in Aguadilla; its salesmen in the region habitually congregated at a local Burger King. 8 this missive nor opened an office in Aguadilla. Meanwhile, plaintiff continued on the job. On September 18, 1990, plaintiff toppled from a ladder while at work. He reported to the State Insurance Fund (SIF) to receive treatment for the injuries sustained. He refrained from working for several weeks on doctor's orders. On November 9, the SIF authorized plaintiff to resume employment. When he reported for duty, however, Gonzalez refused to reinstate him. A conversation ensued, during which Gonzalez asked plaintiff his age and then counseled him to collect his pension rather than to "screw" himself by returning to work. Appellant disputed plaintiff's version of this conversation, suggesting that any remarks by Gonzalez were motivated solely by a concern for plaintiff's health and physical condition. Having been shut out of the workplace, plaintiff repaired to the SIF. A functionary there told him that he needed a letter from his employer as to why he had not been allowed to reclaim his job. Plaintiff went to appellant's place of business on Monday, November 12, and again requested reinstatement. His entreaty fell on deaf ears. He then asked for an explanatory letter, and was told to return some other time since it was a firm holiday and only a skeleton staff was on hand. Plaintiff reappeared later the same week, bearing a letter he himself had composed. The letter stated that appellant had "ordered" him to return to the SIF. When he sought to have Gonzalez sign the letter, Gonzalez's secretary told him to retype 9 it, substituting "suggested" for "ordered." Plaintiff complied, but Gonzalez still refused to sign the document. The barring of the company's doors on November 9 and the events of the following week proved to be the straws that broke the dromedary's back. When Gonzalez withheld the letter to the SIF, plaintiff left Proico's premises, went directly to the offices of the Puerto Rico Labor Department, and filed an administrative complaint charging age discrimination. Two men in their twenties assumed his duties on a temporary basis. Plaintiff never returned to Proico's employ. At first, he was unable to obtain unemployment benefits (apparently due to the lack of the required letter) and soon declared bankruptcy.5 He returned to the SIF for periodic medical treatment until he received a full discharge on March 7, 1991.6 Several weeks later the company officially terminated plaintiff's employment and hired a 36-year-old man as his permanent replacement. Thereafter, plaintiff filed suit in federal district court with the results previously described. C. ADEA Liability. C. ADEA Liability. ______________ In a trio of related arguments, appellant maintains  ____________________ 5Plaintiff ultimately secured unemployment benefits, but the record is silent as to the date. 6With certain limitations (not relevant here), Puerto Rico law requires an employer to reserve an injured worker's position for a minimum of 15 days following the employee's full discharge from the SIF. See P.R. Laws Ann. tit. 11, 7 (1983). Believing ___ that he had been constructively discharged in November, Sanchez made no effort to reclaim his job in March of 1991. The jury's verdict had the effect of validating this course of conduct. 10 that plaintiff failed to establish a prima facie case of age discrimination, and that the evidence supports neither the jury's finding that appellant violated the ADEA nor its determination of willfulness. We deal sequentially with these assertions. 1. The Prima Facie Case. The claim that underlies 1. The Prima Facie Case. ______________________ appellant's first line of attack that the case should not have reached the jury because plaintiff failed to establish a prima facie case betrays confusion concerning the operation of the burden-shifting framework that applies in many employment discrimination cases (including this one). The ADEA makes it unlawful for an employer to "discharge any individual or otherwise discriminate . . . with respect to . . . terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. 623(a). Due to the difficulties of unmasking intentional discrimination, a task that has been described as "elusive," Texas Dep't of Community _________________________ Affairs v. Burdine, 450 U.S. 248, 255 n.8 (1981), courts have _______ _______ crafted a burden-shifting framework to be used in cases where direct evidence of intentional discrimination is lacking. See ___ id. at 255-56; see also McDonnell Douglas Corp. v. Green, 411 ___ ___ ____ _______________________ _____ U.S. 792, 802-05 (1973). Under this framework, the initial burden is on the plaintiff, who must make a prima facie showing of discrimination. The prima facie case requirement embodies a concept, not a mechanical exercise. Though its contours generally follow the McDonnell Douglas model, a prima facie case must be custom- _________________ 11 tailored to fit both the particular animus (e.g., age ____ discrimination, sex discrimination, race discrimination) and the particular type of employment decision involved (e.g., failure to ____ hire, failure to promote, failure to retain). The case at bar is an ADEA case charging wrongful termination of employment. In such circumstances, the plaintiff can establish a prima facie case by adducing evidence that (i) he is a member of the protected class, i.e., over 40 years old, (ii) the quality of his ____ work met the employer's legitimate expectations, (iii) the employer nevertheless cashiered him, and (iv) the employer sought a replacement with roughly equivalent occupational qualifications, thereby demonstrating a continuing need for the same services and skills.7 See Vega v. Kodak Caribbean, Ltd., 3 ___ ____ _____________________ F.3d 476, 479 (1st Cir. 1993); Mesnick v. General Elec. Co., 950 _______ _________________ F.2d 816, 823 (1st Cir. 1991), cert. denied, 112 S. Ct. 2965 _____ ______ (1992); Hebert v. Mohawk Rubber Co., 872 F.2d 1104, 1110 (1st ______ __________________ Cir. 1989). The burden of making out a prima facie case belongs to  ____________________ 7Appellant insists that plaintiff also had to show that his employer ultimately hired a replacement who was not a member of the protected class. The case law in this circuit is to the contrary. See, e.g., Cumpiano v. Banco Santander Puerto Rico, ___ ____ ________ ____________________________ 902 F.2d 148, 155 (1st Cir. 1990) (stating that "we have never held that the . . . prima facie discharge case can be fulfilled only if the complainant shows that she was replaced by someone outside the protected group"); Freeman, 865 F.2d at 1335 n.2 _______ (explaining that "replacement by a younger person . . . is not an element of the plaintiff's prima facie case in an ADEA suit"); cf. St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2758 n.1 ___ ______________________ _____ (1993) (Souter, J., dissenting) (citing Cumpiano and noting that ________ the Supreme Court has not addressed the question). At any rate, plaintiff made the showing here. 12 the plaintiff, but it is "not onerous." Burdine, 450 U.S. at _______ 253. All that is needed is the production of admissible evidence which, if uncontradicted, would justify a legal conclusion of discrimination. See St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. ___ ______________________ _____ 2742, 2747 (1993). However, it is important to remember that the contours of a prima facie case are flexible and situation- specific. Thus, in applying this rubric to the instant case, we must take into account a special wrinkle: here, plaintiff claims a constructive discharge as opposed to an outright dismissal. We have used the term "constructive discharge" to describe employer action that makes "[work] so arduous or unappealing, or working conditions so intolerable, that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities." Vega, 3 F.3d at 480; see also Alicea Rosado v. ____ ___ ____ _____________ Garcia Santiago, 562 F.2d 114, 119-20 (1st Cir. 1977). A ________________ constructive discharge also may occur when an employer effectively prevents an employee from performing his job. See, ___ e.g., Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992) ____ _______________ _______ (finding constructive discharge when an employer, inter alia, _____ ____ "removed all of [plaintiff's] files and then chastised him for not doing his work"); Parrett v. City of Connersville, 737 F.2d _______ ____________________ 690, 694 (7th Cir. 1984) (finding constructive discharge where supervisor removed all work and responsibilities from employee), cert. denied, 469 U.S. 1145 (1985). _____ ______ Silhouetted against this backdrop, appellant's argument seems misshapen in two respects. First and foremost, plaintiff 13 succeeded in limning a prima facie case: he was in his late sixties; his immediate supervisor and his sole co-worker both praised his job performance; SIF's physicians believed that he was medically fit to resume his duties by November 9; he attempted to return to work on that date, yet appellant refused to reinstate him and thereafter spurned at least one other direct request for reinstatement; and appellant concedes that it had a continuing need for the position. This gusher of evidence possessed more than enough force to exceed the relatively low threshold on which the prima facie case requirement rests. Second, the question posed by appellant's challenge is fundamentally irrelevant. Once a prima facie ADEA case has been established under the McDonnell Douglas framework, an inference _________________ of discrimination arises. See Mesnick, 950 F.2d at 823-25 ___ _______ (elucidating the burden-shifting framework). At this point, the burden switches to the employer to articulate a legitimate nondiscriminatory reason for the challenged action. This is a burden of production, not of persuasion; the employer merely must "set forth, through the introduction of admissible evidence, reasons for its action which, if believed by the trier of fact, _________________________________ would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's, 113 S. Ct. at 2747 __________ (internal quotation omitted); accord Woods v. Friction Materials, ______ _____ ___________________ Inc., ___ F.3d ___ (1st Cir. 1994) [No. 93-2296, slip op. at 9]. ____ If, as in this case, the employer meets the burden of production, the inference arising from the plaintiff's prima 14 facie case "drops from the case." St. Mary's, 113 S. Ct. at 2747 __________ (quoting Burdine, 450 U.S. at 255 n.10). The plaintiff, who _______ retains the burden of proof throughout, then must persuade the trier of fact that he has been victimized by intentional discrimination. See id. at 2748-49. In this campaign, the facts ___ ___ _____ that comprised plaintiff's prima facie case may be considered, but the inference of discrimination originally attributable to those facts no longer pertains. See id. at 2749; Mesnick, 950 ___ ___ _______ F.2d at 823. To carry the devoir of persuasion on this ultimate issue, the plaintiff must identify probative evidence suggesting that the reason given by the employer for the employment action is pretextual, and, moreover, that it is a pretext for age discrimination.8 See e.g., Mesnick, 950 F.2d at 823-24; Medina- ___ ____ _______ _______ Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. _____ ___________________________ 1990); Freeman, 865 F.2d at 1336. _______ As can readily be seen from this analysis, when, as now, an employment discrimination action has been submitted to a jury, the burden-shifting framework has fulfilled its function, and backtracking serves no useful purpose. To focus on the existence of a prima facie case after a discrimination case has  ____________________ 8Depending on the facts of the particular case, showing a defendant's articulated explanation for an employment decision to be pretextual may or may not suffice to establish age discrimination, "particularly if disbelief is accompanied by a suspicion of mendacity." St. Mary's, 113 S. Ct. at 2749; see ___________ ___ also Hazen Paper Co. v. Biggins, 113 S. Ct. 1701, 1708 (1993); ____ ________________ _______ Woods, ___ F.3d at ___ n.3 [slip op. at 11 n.3]. We need not _____ probe the point today, as Sanchez adduced independent evidence which, when credited by the jury, sufficed to establish appellant's discriminatory animus. 15 been fully tried on the merits is to "unnecessarily evade[] the ultimate question of discrimination vel non." United States ______________ Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 713-14 (1983); _________________________ ______ see also Mesnick, 950 F.2d at 824-25. By like token, our ___ ____ _______ evaluation of post-trial motions seeking relief from a jury's verdict in such a case is similarly confined to the ultimate question of discrimination. Consequently, to wander afield in pursuit of appellant's phantom "prima facie case" argument is a bit like undertaking early morning calisthenics: it might be good exercise, but it certainly is not essential to the business of the day. For these reasons, appellant's first argument is unavailing. 2. Sufficiency of the Evidence. The heart of 2. Sufficiency of the Evidence. ______________________________ appellant's ADEA challenge is its claim of evidentiary insufficiency. We have combed the record and detect a surfeit of evidence from which a rational jury could have concluded that appellant transgressed the law. The evidence much of which is highlighted in Part II(B), supra is copious enough that a lengthy exegesis, laden _____ with exquisite detail, would serve no useful purpose. It suffices to say that, although appellant articulated a plausible, nondiscriminatory reason for refusing to reinstate plaintiff it contended that he had not sufficiently recovered from his injuries to resume his duties on November 9, 1990 the jury rejected that explanation. And the jury's skepticism has strong 16 roots in the record. It is undisputed that appellant refused to reinstate Sanchez on November 9. Thus, the jury had to determine whether that refusal constituted a constructive discharge, as Sanchez contended, or whether, as appellant contended, it constituted a bona fide personnel decision based on Sanchez's incomplete recovery from his injuries. The jury did not have to make this determination in a vacuum. It heard evidence, for example, about Catinchi's serial reprimands of plaintiff reprimands that, given Soto's testimony, the jury could have believed to be bogus. The jury also heard evidence about a "promotion" that seemed to be no promotion at all, but more like the kiss of death. The jury plausibly could have thought the entire Aguadilla affair to have been a subterfuge aimed at forcing plaintiff's resignation. Then, too, the jury heard evidence about the SIF's assessment of plaintiff's health status and supportably could have found Gonzalez's contrary views to be pretextual, particularly in light of his refusal to sign a letter to the SIF explaining why plaintiff had not been reinstated. Last, but surely not least, after having refused to reinstate Sanchez, Gonzalez questioned him about his age and made other age-related remarks that the jury reasonably could have construed as evincing bias. Indeed, if the jury credited plaintiff's version of this conversation as it had a right to do, especially since Gonzalez, though available, was never called to testify at trial Gonzalez's statements comprise potent evidence of age-based animus. 17 We will not trespass on the reader's indulgence. Here, a perceptive jury, making permissible credibility choices and drawing lawful inferences, could conclude that appellant embarked on a course of conduct designed to purge plaintiff from the work force; that the sudden offer of a sham "promotion" was a step in the plot; that, after the promotion ploy failed, plaintiff's injury presented appellant with a fresh opportunity to reach its goal; that appellant turned plaintiff away on November 9 despite its knowledge that plaintiff had recuperated sufficiently to perform his job, thereby constructively discharging him; and that appellant's actions were motivated by a discriminatory animus directed at plaintiff's age. In short, a reasonable factfinder easily could have resolved liability as did the jurors in this case without perpetrating a miscarriage of justice. Hence, appellant has not surmounted the daunting obstacles posed by the standards of review governing the district court's denial of its post-trial motions. D. Willfulness. D. Willfulness. ___________ Next, appellant contends that the lower court erred in upholding the jury's finding of willfulness. This contention is unpersuasive. Willfulness is an issue in ADEA cases because the statute entitles a prevailing plaintiff to doubled backpay in situations involving "willful violations." 29 U.S.C. 626(b). Congress intended this liquidated damage provision to be punitive, thereby serving to deter willful misconduct. See Trans ___ _____ 18 World Airlines, Inc. v. Thurston, 469 U.S. 111, 125 (1985). For ____________________ ________ this purpose, a violation is considered willful if "the employer . . . knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Id. at 126. ___ A finding of willfulness requires something more than merely showing that an employer knew about the ADEA and its potential applicability in the workplace. See id. at 127-28. ___ ___ For example, in the context of determining whether a settled corporate policy violated the ADEA, the Thurston Court concluded ________ that the company's reasonable, good-faith efforts to determine that the policy complied with the ADEA sufficed to avoid a finding of willfulness even though the policy violated the law. See id. at 129. Willfulness, then, requires an element akin to ___ ___ reckless disregard of, or deliberate indifference to, an employer's ADEA-related obligations. See Hazen Paper Co. v. ___ ________________ Biggins, 113 S. Ct. 1701, 1708 (1993) ("The word `willful' is _______ widely used in the law, and . . . it is generally understood to refer to conduct that is not merely negligent.") (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see __________ _________________ ___ also Benjamin v. United Merchants & Mfrs., Inc., 873 F.2d 41, 44 ____ ________ ______________________________ (2d Cir. 1989) (explaining that an ADEA violation is willful if the evidence shows that the employer has not merely "acted negligently, inadvertently [and] innocently," but has been "indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion"). In Biggins, the Supreme Court held that Thurston's _______ ________ 19 definition of willfulness is applicable not only when the violation is a "formal, facially discriminatory policy, as in Thurston," but also when the violation is "an informal decision ________ by an employer that was motivated by the employee's age[.]" 113 S. Ct. at 1705, 1708-10.9 As in Thurston, the Court noted that ________ episodic violations of the ADEA in disparate treatment cases need not automatically lead to the imposition of liquidated damages: "If an employer incorrectly but in good faith and nonrecklessly believes that the statute permits a particular age-based decision, then liquidated damages should not be imposed." Id. at ___ 1709. We will not tarry. In this case, on any tenable view of the law, there is a firm factual foundation for a finding that Proico willfully flouted the ADEA. Here, the appellant's misconduct lay at the exact crossroads of the antidiscrimination  ____________________ 9Prior to the Court's opinion in Biggins, the circuits were _______ in considerable disarray as to the quality and quantity of evidence, beyond evidence of mere awareness, that is necessary to underbrace an award of liquidated damages in an ADEA case. Compare, e.g., Dreyer v. Arco Chem. Co., 801 F.2d 651, 658 (3d _______ ____ ______ _______________ Cir. 1986) (requiring "outrageous conduct"), cert. denied, 480 _____ ______ U.S. 906 (1987) with, e.g., Brown v. M & M/Mars, 883 F.2d 505, ____ ____ _____ __________ 513 (7th Cir. 1989) (rejecting the Third Circuit's approach). The Biggins Court explicitly rejected the Third Circuit's _______ formulation, and labelled as "misplaced" the concern of various circuits that application of the Thurston definition was ________ inappropriate in the context of "an informal disparate treatment case." 113 S. Ct. at 1709. The Court reasoned that the "only distinction between Thurston and [an informal disparate treatment ________ case] is the existence of formal discrimination. Age entered the employment decision there through a formal and publicized policy, and not as an undisclosed factor motivating the employer on an ad hoc basis . . . surely an employer's reluctance to acknowledge its reliance on the forbidden factor should not cut against _______ imposing a penalty." Id. at 1709-10. ___ 20 laws and the employment relationship; discharge and constructive discharge are among the paradigmatic employment decisions to which the ADEA is addressed, and appellant knew or, at least, should have known that its corporate behavior ran afoul of the antidiscrimination laws. Moreover, the jury had an adequate basis for a finding that appellant's refusal to reinstate plaintiff was both the culmination of a deliberate strategy and the crowning blow in a series of actions reflecting age-based discrimination; or, cloaked in the words of the Biggins Court, _______ that, notwithstanding the lack of a "formal and publicized policy" productive of discrimination, there is "an undisclosed factor motivating the employer on an ad hoc basis," id. The ___ questionable reprimands, the audiences demanded by Catinchi, and the so-called promotion could all be viewed as steps toward this end. And the employer's conduct after refusing to reinstate Sanchez (including its failure to furnish the SIF with a written explanation) strongly reinforce the suggestion that what befell Sanchez was anything but a mere fortuity. On this pithy record, we are confident that the jury had a right to weave these several evidentiary threads into a tapestry of calculated misconduct from which it could infer that Proico's conduct toward plaintiff was not merely negligent, but bordered on the contemptible. Appellant's actions clearly fall outside the safe haven for good faith but incorrect conduct described in Biggins and Thurston. Thus, the jury's finding of _______ ________ 21 willfulness is unimpugnable.10 III. MENTAL AND MORAL DAMAGES III. MENTAL AND MORAL DAMAGES Appellant's penultimate point is that, as a matter of law, there was insufficient evidence to support an award of damages under Puerto Rico's comprehensive employment discrimination statute. This statute, familiarly known as Law 100, creates a private cause of action in favor of any person who is discharged or otherwise adversely affected in employment by reason of, inter alia, age discrimination.11 An age _____ ____  ____________________ 10To be sure, appellant maintains that its violation cannot be considered willful because it did not take reprisals against Sanchez for refusing the Aguadilla assignment. This reasoning is specious. At best, this evidence is relevant, but not dispositive. Moreover, it addresses only one of the several actions improperly taken against the plaintiff; on this record, a reasonable jury could have found a willful violation even if it had determined that the promotion incident, in and of itself, did not transgress the ADEA. 11The statute states in relevant part: Any employer who discharges, lays off or discriminates against an employee regarding his salary, wage, pay or remuneration, terms, rank, conditions, or privileges of his work, or who fails or refuses to hire or rehire a person, or who limits or classifies his employees in any manner which tends to deprive a person of employment opportunities, or to affect his status as employee, on the basis of age . . . race, color, sex, social or national origin or social position, political or religious beliefs of the employee or applicant for employment: (a) shall incur civil liability (1) for a sum equal to twice the amount of damages sustained by the employee or applicant for employment on account of such action. 22 discrimination action brought under Law 100 differs from one brought under the ADEA in two significant respects. First, as we recognized in Wildman v. Lerner Stores Corp., 771 F.2d 605 (1st _______ ___________________ Cir. 1985), in an action brought under the ADEA, the plaintiff retains the burden of proof throughout the trial; in an action brought under Law 100, in contrast, the burden of proof shifts to the defendant once the plaintiff has established a prima facie case. See id. at 609. Second, and more noteworthy for present ___ ___ purposes, Law 100 permits a plaintiff, upon appropriate proof, to recover damages for emotional distress (or "mental and moral suffering," to use the term employed by the district court and the parties). See Garcia Pagan v. Shiley Caribbean, 122 D.P.R. ___ ____________ ________________ 193 (1988). With this preface, we turn to appellant's sufficiency challenge. As an initial matter, it should be noted that we consider this challenge only in connection with the district court's denial of appellant's motion for a new trial. Proico neglected to make the sufficiency claim when moving for judgment as a matter of law at the close of the evidence, and, thus, failed to preserve it for appeal. See Fed. R. Civ. P. 50(b). ___ This is a fatal omission, for "[if] a defendant wishes to renew a motion for judgment as a matter of law at the post-trial stage with a view to having denial of that motion considered by the court of appeals, the defendant is required to have moved for judgment as a matter of law at the close of all the evidence."  ____________________ P.R. Laws Ann. tit. 29, 146 (Supp. 1989). 23 Keisling v. SER-Jobs for Progress, Inc., 19 F.3d 755, 758 (1st ________ ____________________________ Cir. 1994); accord Jusino v. Zayas, 875 F.2d 986, 991 (1st Cir. ______ ______ _____ 1989). Simply stated, "[a] party may not base its motion for a judgment n.o.v. on a ground that was not argued in its motion for a directed verdict." Systemized of New England, Inc. v. SCM, _________________________________ ____ Inc., 732 F.2d 1030, 1035-36 (1st Cir. 1984). ____ Although the front door is closed, the back door remains ajar. Appellant did raise its sufficiency claim in its motion for new trial and, to that extent, we must consider it in connection with our assessment of the weight of the credible evidence. See id. at 1036-37. Having reached a variation of the ___ ___ issue, however, we can swiftly dispose of it. We regularly have said that "[t]ranslating legal damage into money damages especially in cases which involve few significant items of measurable economic loss is a matter peculiarly within a jury's ken." Wagenmann, 829 F.2d at 215; accord Ruiz v. Gonzalez _________ ______ ____ ________ Caraballo, 929 F.2d 31, 34 (1st Cir. 1991). And here, the _________ deferential nature of appellate oversight is accentuated because, while the jury originally awarded plaintiff $150,000 for emotional distress, the district court reduced the award to $37,500.12 It is a well-established principle that:  ____________________ 12Of course, the district court then doubled the pared award pursuant to the statutory command that an employer's liability is for "a sum equal to twice the amount of damages sustained by the employee." P.R. Laws Ann. tit. 29, 146(a)(2). For the purpose of our analysis, however, the relevant figure is the underlying damage award not the doubled award because the doubling that Law 100 requires is not tied to any particular evidentiary showing on the plaintiff's part. 24 Once a verdict has been trimmed and reshaped at the hands of the trial judge, an assault on the remaining amount calls upon [the court of appeals] not merely to grade the essay, but to grade the teacher's grading of the essay. The resultant constraints are not inconsiderable. We agree with the Fifth Circuit that "[w]here the trial court already has invoked its discretion in granting a remittitur, [the] scope of review is even narrower than usual." Stapleton v. Kawasaki _________ ________ Heavy Industries, Ltd., 608 F.2d 571, 574 n.7 ______________________ (5th Cir. 1979). Ruiz, 929 F.2d at 34-35 (quoting Wagenmann, 829 F.2d at 215). ____ _________ The appellant must show, therefore, that the reduced figure remains so extravagant as to shock the appellate conscience. See ___ id. at 35. ___ Appellant asserts that the evidence is insufficient to allow the award of any sum of money for mental and moral ___ suffering. This assertion seemingly rests on the absence of trial testimony from any mental health professional say, a psychiatrist or psychologist. But appellant cites no case that stands for the proposition that expert testimony is a prerequisite to an award of damages for mental and moral suffering. In other jurisdictions, expert testimony ordinarily is not required to ground money damages for mental anguish or emotional distress. See, e.g., Wulf v. City of Wichita, 883 F.2d ___ ____ ____ _______________ 842, 875 (10th Cir. 1989) (upholding award of damages for mental anguish and distress based solely on lay testimony); Busche v. ______ Burkee, 649 F.2d 509, 519 n.12 (7th Cir.) (rejecting requirement ______ of testimony of medical or psychiatric experts for award of damages for emotional distress), cert. denied, 454 U.S. 897 _____ ______ 25 (1981); Gore v. Turner, 563 F.2d 159, 164 (5th Cir. 1977) ____ ______ (stating that damages for emotional distress "may be inferred from the circumstances as well as proved by the testimony") (citations omitted); see also Carey v. Piphus, 435 U.S. 247, 264 ___ ____ _____ ______ n.20 (1978) ("Although essentially subjective, genuine injury in this respect [mental suffering or emotional anguish] may be evidenced by one's conduct and observed by others."); Marable v. _______ Walker, 704 F.2d 1219, 1220 (11th Cir. 1983) (holding that ______ absence of "evidence of pecuniary loss, psychiatric disturbance, effect of social activity, or physical symptoms . . . go[es] more to the amount, rather than the fact, of damage[s]" for emotional distress). We see no basis for imputing a more stringent rule under Puerto Rico law.13 Over and beyond this hurdle, we think that the evidence of record adequately supports the pared award. A recovery of $37,500 for emotional distress can "fairly be said to flow from the evidence adduced at trial," Ruiz, 929 F.2d at 35, especially ____ given plaintiff's testimony that appellant's conduct in wrongfully discharging him not only stripped him of his livelihood and dignity, but also drove him into bankruptcy.14  ____________________ 13We hasten to add that the district court appropriately took the absence of such evidence into account in fashioning a remittitur, finding that "since psychological and psychiatric evidence was not presented, the record would only support a $37,500 award for pain, mental suffering, and humiliation." The plaintiff accepted the remittitur on this count as on the ADEA count. 14Plaintiff testified that he was deeply affected by having to declare bankruptcy because he had always "religiously" paid his debts. 26 Then, too, plaintiff testified emphatically about the humiliation that he suffered in the course of shuttling futilely back and forth between Proico and the SIF, and the jury could well have credited that testimony. We believe that we have written enough to give the reader the flavor of the record. Though plaintiff's case on damages was relatively asthenic, we cannot say that the reduced award was unjustified or that it offends our collective conscience. Cf. Wagenmann, 829 F.2d at 215 (finding damages ___ _________ justified when record reflected "stress, fear, humiliation, embarrassment, and stigmatization"). IV. DUPLICATIVE DAMAGES IV. DUPLICATIVE DAMAGES Appellant's last asseveration is that the district court erred by doubling plaintiff's damages under both the ADEA and Law 100. This asseveration presents a pure question of law, thereby sparking de novo review.15 See McCarthy v. Azure, 22 __ ____ ___ ________ _____ F.3d 351, 354 (1st Cir. 1994); Liberty Mut. Ins. Co. v. ________________________ Commercial Union Ins. Co., 978 F.2d 750, 757 (1st Cir. 1992). _________________________ In different legal contexts we have several times  ____________________ 15In the interest of clarity we think it worthwhile to note that appellant does not argue that the underlying damage awards are duplicative. Indeed, they are not: the jury awarded Sanchez compensation for the independent losses of backpay under ADEA and mental anguish under Law 100, see supra note 1. Similarly, ___ _____ appellant does not argue that either the aggregate damages or the total punitive damages are so great as to insult due process. See generally Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1 ___ _________ ____________________________ ______ (1993). Appellant argues only that doubling both underlying awards is duplicative. 27 expressed the principle that "a plaintiff is entitled to only one full recovery, no matter how many legal grounds may support the verdict." Freeman, 865 F.2d at 1345; see also Linn v. Andover _______ ___ ____ ____ _______ Newton Theolog. Sch., Inc., 874 F.2d 1, 6-8 (1st Cir. 1989). ____________________________ Appellant argues that this doctrine has application here: doubling both the ADEA and Law 100 awards, appellant avers, allows the plaintiff to recover twice for the same loss. Appellant's postulate does not survive scrutiny.16 Liquidated damages under ADEA are punitive in nature, and are intended to deter violations. See Thurston, 469 U.S. at 125. In ___ ________ contrast, the Puerto Rico Supreme Court, in interpreting the damages provisions of Law 100, has stated that the legislature's "intent was to devise a formula to redress damages arising from discrimination in employment." Garcia Pagan v. Shiley Caribbean, ____________ ________________ 122 D.P.R. 193 (1988). This language fits far more comfortably with an aim to compensate rather than to punish or deter. To this extent, then, the ADEA and Law 100 awards serve different ends and represent distinct types of damage awards.  ____________________ 16The cases relied on by appellant discuss a different scenario. In the pre-Thurston era, liquidated damages under the ________ ADEA were often thought to be compensatory in nature. See, e.g., ___ ____ Gibson v. Mohawk Rubber Co., 695 F.2d 1093, 1102 (8th Cir. 1982). ______ _________________ When a discrimination victim received both liquidated damages and prejudgment interest, some courts took the view that liquidated damages were intended to "cover, among other things, loss due to delay," and, therefore, held that awarding both liquidated damages and prejudgment interest would constitute an improper multiple recovery, for "loss due to delay [is] precisely what prejudgment interest protects against. Linn, 874 F.2d at 6; see, ____ ___ e.g., Kolb v. Goldring, 694 F.2d 869, 875 (1st Cir. 1982); Blim ____ ____ ________ ____ v. Western Elec. Co., 731 F.2d 1473, 1479-80 (10th Cir.), cert. _________________ _____ denied, 469 U.S. 874 (1984). ______ 28 Consequently, the two awards, though calculated in part by the same formula, i.e., doubling, cannot be deemed duplicative. Cf. ____ ___ Lilley v. BTM Corp., 958 F.2d 746, 755 (6th Cir.) (holding that ______ _________ awards for liquidated damages under ADEA and prejudgment interest under state antidiscrimination statute are not duplicative because the ADEA's "liquidated damages are punitive [while the] prejudgment interest [is] compensatory"), cert. denied, 113 S. _____ ______ Ct. 376 (1992). Be that as it may, this appeal does not require us to decide today whether the doubling under Law 100 has a compensatory thrust. Even if we were to assume arguendo the ________ opposite, i.e., that doubling under Law 100 is punitive in ____ nature, appellant would not profit. Punitive damages are directed at deterring and punishing defendants; they are not __________ designed to compensate plaintiffs for losses. See Thurston, 469 ___ ________ U.S. at 125; Robertson Oil Co. v. Phillips Petroleum Co., 14 F.3d _________________ ______________________ 373, 383 (8th Cir. 1993), cert. denied, 114 S. Ct. 2120 (1994). _____ ______ As such, the considerations that operate to bar multiple recoveries are conceptually and legally inapplicable to punitive damages. Of course, potential punitive liability may be limited by legislative intent or due process, see TXO Prod'n Corp. v. ___ _________________ Alliance Resources Corp., 113 S. Ct. 2711, 2718-19 (1993); __________________________ Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 14-15 (1991), ___________________________ ______ but appellant has not argued either of those aspects in this appeal. And apart from statute or constitutional considerations, we know of no legal concept of duplicative awards that functions 29 as a limitation on exemplary damages. Thus, we come full circle. Regardless of whether the doubling of a Law 100 award for mental and moral suffering is conceived to be compensatory or punitive in nature, appellant's argument fails. V. CONCLUSION V. CONCLUSION We need go no further. The record reveals ample evidence to sustain the jury's finding that appellant willfully terminated plaintiff's employment due to his age, thereby transgressing both federal and Commonwealth statutes. The ensuing damage awards, as refined by the district court, are also within lawful parameters. Proico's ship has sailed. Affirmed. Affirmed. ________ 30