# United States Court of Appeals
## For the First Circuit

No. 10-1655

JULISSA APONTE-RIVERA,

Plaintiff, Appellee,

v.

DHL SOLUTIONS (USA), INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Harry D. Leinenweber, U.S. District Judge]

Before

Lipez, Siler,* and Howard, Circuit Judges.

Lourdes C. Hernández-Venegas, with whom Mariela Rexach-Rexach, Shiara L. Diloné-Fernández, and Schuster Aquiló LLP were on brief, for appellant.
Rubén T. Nigaglioni-Mignucci, Sr., with whom Nigalioni & Ferraiuoli was on brief, for appellee.

May 25, 2011

*Of the Sixth Circuit, sitting by designation.

**SILER**, **Circuit Judge**.  Julissa Aponte-Rivera ("Aponte") sued her former employer, DHL Solutions, Inc. ("DHL"), claiming gender-based discrimination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and Puerto Rico law.  The jury returned a verdict in favor of Aponte and awarded her emotional distress damages.  The district court upheld the jury's verdict, but remitted the damages award.  On appeal, DHL disputes the sufficiency of the evidence supporting the jury's verdict, the amount of the remitted damages award, and evidentiary rulings.  For the following reasons, we affirm.

**I.**

**A.  Facts**

Aponte began working at DHL in 2000.  By 2003, she worked as a logistics operations manager, a role in which she supervised employees, oversaw shipments and documentation, and interacted with DHL's clients.

In 2004, Enrique Frias was named regional manager and became Aponte's supervisor.  In the months following his appointment, two major clients of DHL's Puerto Rico operation complained about DHL's performance.  Frias and other management investigated the causes of the customer problems and implemented plans to remedy them.

In June 2004, Aponte filed a written complaint with DHL's human resources department.  She complained that her supervisor

created an "uncomfortable" work environment by giving her an overwhelming workload and making several comments with sexual connotations. Blanca Hernandez, a DHL human resources manager, interviewed Aponte and Frias in response to the complaint. Hernandez told Frias, "don't get personal" and "focus in [sic] the operation and in work." Shortly after filing this complaint, Aponte took a leave of absence that lasted approximately one month.

A position for program manager became available in November 2004, and Aponte applied for the position. Aponte testified that, during her interview with Frias, he was aggressive and would not allow her to fully answer questions. Rafael Camacho was eventually chosen for the position.

Aponte testified that Camacho, after he began working at DHL, referred to a woman in an authority position as "jefecita" ("little boss"), and stated that women were good for household chores. She also testified that Camacho generally referred to women as "brutas," or "dumbies." Aponte worked with Camacho for approximately one month before leaving work for eleven months on a second leave of absence.

Aponte returned to DHL in November 2005 and was assigned to report to Camacho. Frias and Camacho confronted Aponte, asking her why she returned instead of resigning. They also said the person who ran the operation "had to have balls." Aponte also reported that Frias told her the logistics operation in Puerto Rico had its

best year in 2005 because it was being run by a man. Joyce Mercado, a co-employee, testified that she overheard this exchange and it was "shameful," and the two men spoke to Aponte in very loud tones. She said that Frias and Camacho generally spoke to male employees "appropriately," and would "treat them okay," which was different from how they treated female employees.

Over the next few months, Camacho gave Aponte a verbal warning and a written warning regarding her performance at work. In March 2006, Aponte again complained to human resources, stating she felt "discriminated based on gender, overwhelmed, distressed and pressured labor wise." Maude Cesari, a DHL human resources employee, went to the office later that month to resolve the complaint. Shortly after their meeting, Aponte thanked Cesari and said she had noticed a positive change.

However, Aponte took another leave of absence a month later, and ultimately resigned from DHL on June 17. Her resignation letter stated that her resignation was involuntary but necessary due to the gender discrimination she suffered at work that left her "in an emotional deterioration."

## B. Procedural History

Aponte brought a hostile work environment and gender discrimination claim against DHL, pursuant to Title VII of the Civil Rights Act of 1964 and various laws of the Commonwealth of Puerto Rico. During trial, DHL moved for judgment as a matter of

law, which was granted for some claims but denied for the gender-based hostile work environment claim. After a four-day trial, the jury rendered a verdict in favor of Aponte and awarded her $350,000 in emotional distress damages.[1]

DHL renewed its motion for judgment as a matter of law and asked the district court to set aside the verdict. It also requested, in the alternative, that a new trial or remittitur be granted. The district court found there was sufficient evidence for a reasonable jury to find in Aponte's favor, and a new trial was not warranted. However, the court determined that "[w]hile the evidence produced at trial regarding Defendant's liability for a hostile work environment was sufficient, similar evidence is lacking to support the damages awarded." After reviewing the evidence and comparing awards from similar cases, the court remitted the award from $350,000 to $200,000.[2]

On appeal, DHL maintains that the evidence was insufficient to support Aponte's hostile work environment claim, and alternatively, that the award should be further remitted. DHL also argues that

---

[1] Pursuant to Puerto Rico law, the district court applied mandatory doubling of damages provisions to the Commonwealth claims, and awarded $1.00 to the Title VII claim, resulting in a total award of $699,999.

[2] After applying the doubling required by Puerto Rico law, as well as attorneys' fees awarded separately, the remitted award amounts to $449,998.75.

the district court made evidentiary errors that require a new trial.

## II.

## A.  Sufficiency of the Evidence

### i.  Standard of Review

When reviewing the sufficiency of the evidence, a jury's verdict "must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have returned the verdict." Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 13 (1st Cir. 2009) (internal quotation marks omitted).  Our analysis "is weighted toward preservation of the jury verdict." Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 57 (1st Cir. 2005).

### ii.  Analysis

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of sex with respect to the terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a)(1).  The plaintiff must establish that (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon gender; (4) the harassment was sufficiently severe or pervasive that it altered the conditions of her employment and created an abusive working environment; (5) the offending conduct was both objectively and

subjectively offensive; and (6) some basis for employer liability has been established. Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007).

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). This standard "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Id. The conduct must create an objectively hostile work environment, as well as the plaintiff's subjective perception that the environment is abusive. Id. at 21-22.

This is not a "mathematically precise test," and whether an environment is "hostile" or "abusive" is determined by looking at all the circumstances. Id. at 22-23. Relevant factors may include the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating as opposed to a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. Id. at 23. While psychological harm may be taken into account, no single factor is required. Id.

DHL argues that the evidence was insufficient to establish that any harassment Aponte experienced was severe and pervasive.

DHL further contends that Aponte fails to show she was treated differently because of her gender, and maintains that many of the comments made to Aponte could be interpreted in a way that does not refer to women. It argues that "rudeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." See Noviello v. City of Boston, 398 F.3d 76, 92 (1st Cir. 2005).

Aponte testified that Frias and Camacho made several gender-based comments to her, including: "that what he had been taught was that women were supposed to do [] household chores"; "the person who ran this operation had to have balls to run the operation"; referring to a female executive as "jefecita," or "little boss"; stating that the operation had to be run by a man; generally referring to women as "brutas," or "dumbies"; and asking her if she was a "pendeja," a pejorative term used to refer to women. She also maintained that Frias and Camacho "didn't have any willingness" to train her on certain tasks. She testified that she took a leave of absence because of the emotional hardship she experienced.

Aponte filed two internal complaints with DHL Human Resources. In the second complaint, she wrote that "the work environment has become completely hostile and without respect to my person, I feel discriminated based on gender, overwhelmed, distressed and pressured labor wise." She felt "completely disoriented" and

"constantly deprived of authority by Rafael Camacho." She also felt that there "really is no change as to my feelings since I reported ill [] January 10, 2005 and my return on November 21, 2005. On the contrary, I feel more discriminated than before[.] I feel at all times the discrimination for reasons of gender."

Mercado testified that the way Camacho and Frias communicated with Aponte "was not very good," "shameful," and "[t]hey would speak to her in a very loud tone, and the way they treated her wasn't the best." She also overheard Frias and Camacho "screaming" at Aponte. When Frias and Camacho spoke to Aponte, "the tones of voice would be very loud, they would be very disrespectful." By contrast, Frias's and Camacho's communication with male employees was "normal," which "was different than how I saw that it was toward the women, the girls there."

Both Frias and Camacho denied saying those comments, and DHL offered a different interpretation of the work situation. They asserted that Aponte was treated differently because of her poor work performance, rather than gender. They claimed that clients complained about Aponte's performance.

Viewing the evidence presented in the light most favorable to Aponte, a reasonable jury could have determined that Frias and Camacho subjected Aponte to discriminatory intimidation, ridicule, and insult sufficiently pervasive to alter the condition of her employment and create a hostile work environment. See Harris, 510

U.S. at 21; <u>Astro-Med</u>, 591 F.3d at 13. It was the jury's role to determine witness credibility, and the verdict indicates that the jury believed Aponte's version of the work environment and its effect on her. This case does not present a situation in which the evidence "so strongly and overwhelmingly" supports DHL's position that we should disturb the jury's verdict. <u>See</u> <u>Astro-Med</u>, 519 F.3d at 13; <u>Rodriguez-Torres</u>, 399 F.3d at 57; <u>cf.</u> <u>Alvarez-Fonseca</u> v. <u>Pepsi Cola</u>, 152 F.3d 17, 25-26 (1st Cir. 1998).

### iii. DHL's <u>Faragher</u> Defense

An employer is vicariously liable for a supervisor's harassment of an employee. <u>Burlington Indus., Inc.</u> v. <u>Ellerth</u>, 524 U.S. 742, 745 (1998). The <u>Faragher</u> affirmative defense shields an employer from such liability if (1) the employer exercised reasonable care to prevent and correct harassment, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. <u>Faragher</u> v. <u>City of Boca Raton</u>, 524 U.S. 775, 807 (1998).

DHL argues that, even taking Aponte's version of the facts as true, the jury unreasonably rejected DHL's <u>Faragher</u> defense. It maintains that the company acted promptly and appropriately, and the March 30 email shows that it improved Aponte's situation.

Aponte filed her initial complaint in November 2004 complaining of Frias's unprofessional behavior, which prompted Hernandez to interview both Aponte and Frias. Two years later, in

-10-

March 2006, Aponte filed a second complaint with Cesari.  Cesari met with Aponte and Camacho later that month.  On March 30, 2006, Aponte sent Cesari an email thanking her for intervening and reporting that the situation had improved.

Aponte later testified that the harassment at work only temporarily improved after the meeting, and the situation soon "turned totally hostile."  Specifically, she felt "pressure" from the work tasks given her, and Camacho and Frias were "underestimating" her, being "disrespectful" to her, and "constantly" pressuring her about backlogged work.  Aponte took a leave of absence in April 2006, and eventually resigned from her position at DHL in June 2006.  She maintains that her decision not to file another formal complaint prior to resigning was understandable, given the fact that her prior complaints "had only resulted in a worsening of her circumstances."

A reasonable jury could find that Aponte availed herself of DHL's corrective opportunities without experiencing a lasting improvement in her work situation.  She complained in writing on two separate occasions, and testified that she ultimately had to quit her job in order to avoid the hostile situation. See White v. N. H. Dep't of Corrections, 221 F.3d 254, 261-62 (1st Cir. 2000) ("The record contains evidence from which the jury could have concluded that the [employer] did not handle the internal

-11-

investigation properly or timely, and that the [employer] allowed the conduct and comments to continue.").

A juror could certainly reach the opposite conclusion, particularly given the conflicting content of Aponte's March 30 letter. However, "[d]etermining what constitutes a 'prompt and appropriate' employer response to allegations of sexual harassment often requires the sort of case-specific, fact-intensive analysis best left to a jury." Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 232 (1st Cir. 2007). Moreover, it was DHL's burden to show its actions both corrected and prevented further harassment. See Burlington, 524 U.S. at 745. Thus, DHL's entitlement to the Faragher defense is not "so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." See Astro-Med, 591 F.3d at 13.

## B. Remittitur

We may overturn a damages award only if it is "grossly excessive or so high as to shock the conscience of this court." Rodriguez-Garcia v. Miranda-Marin, 610 F.3d 756, 773 (1st Cir. 2010) (quoting Valentin-Almeyda v. Mun. of Aguadilla, 447 F.3d 85, 103 (1st Cir. 2006)). We afford "broad discretion" to the trial court's decision, because of that court's "greater familiarity with local community standards and with the witnesses' demeanor at the trial." Id. "We will not disturb an award of damages because it is extremely generous or because we think the damages are

considerably less." Koster v. Trans World Airlines, 181 F.3d 24, 34 (1st Cir. 1999). "Where the trial court already has invoked its discretion in granting a remittitur, the scope of review is even narrower than usual." Sanchez v. P.R. Oil Co., 37 F.3d 712, 724 (1st Cir. 1994).

Here, the district court remitted the jury's award from $350,000 to $200,000, explaining in length its reasons for doing so. The court found that although the evidence produced at trial was sufficient to show a hostile work environment, the evidence did not support the amount of damages awarded. The court described the source of the emotional distress as "at best, mixed." Aponte experienced distress due to mental health issues, physical ailments, and general work stress in addition to the stress from her hostile work environment. Moreover, Aponte suffered from a back problem, and DHL's business was expanding during the relevant time period. Additionally, the court explained that economic damages such as claims for failure to promote, front pay, back pay, and constructive discharge were not part of the verdict.

The court also pointed out that Aponte "did not introduce any testimony by a medical expert," "presented no notable evidence of outward manifestations of emotional distress," and "presented no evidence of long term depression or medical treatment." "Although testimony from a mental health expert is not required to sustain an award for emotional distress, the absence of such evidence is

-13-

useful in comparing the injury to the award of damages." Koster, 181 F.3d at 35.

Awards in comparable cases are instructive. The plaintiff in Sanchez, who was discriminated against because of his age, testified about the humiliation he suffered from losing his job and filing for bankruptcy, but failed to present any medical testimony regarding his mental condition. 37 F.3d at 724. The jury awarded him $150,000 in emotional distress damages. Id. at 723. The district court reduced the award to $37,500, and we affirmed. Id. at 726. We held that, although emotional damages are warranted even without medical or psychiatric evidence, the lack of such evidence is relevant to the amount of the award. Id. at 724 n.13.

In Rodriguez-Garcia, the jury awarded the plaintiff $350,000 for emotional pain and suffering related to a retaliatory demotion. 610 F.3d at 760. The plaintiff, as well as her psychiatrist, testified that she experienced depression. Id. at 773. We held that, "[a]lthough generous, the award of $350,000 was not grossly excessive or so high as to shock the conscience." Id. at 774. Additionally, the amount of the award was similar to noneconomic compensatory damages awards we upheld in other employment discrimination and retaliation contexts. Id.

In Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164 (1st Cir. 2009), we upheld a $333,000 damages award in a sexual harassment case. Id. at 174-75.

-14-

The plaintiff testified that she was harassed by a male supervisor, making her work conditions intolerable. Id. at 168. She stated that she suffered from depression, cried every evening, and was unable to sleep. Id. at 174-75. Although we wrote that "[a]dmittedly the jury was generous in awarding this amount," we held that the district court did not abuse its discretion, given comparable awards and the highly deferential standard of review. Id. at 175.

We have also upheld damages awards where the plaintiff did not seek medical treatment or have long-term physical symptoms. See McDonough v. City of Quincy, 452 F.3d 8, 22 (1st Cir. 2006) (upholding award of $300,000 in Title VII retaliation case, where "the bulk" of the award was for emotional distress in the form of humiliation and damage to reputation and family relationships); Rodriguez-Torres, 399 F.3d at 64 (affirming a $250,000 emotional distress award where plaintiff testified that employment discrimination caused her marriage to suffer and made her depressed); Koster, 181 F.3d at 35-36 (upholding $250,000 award where plaintiff testified that employer's conduct caused him to suffer anxiety and insomnia and damaged his family life).

In light of these comparable cases, and given the court's lengthy explanation for its remittitur, the district court did not abuse its discretion in awarding Aponte the remitted amount. The court noted that Aponte's testimony regarding her distressed

-15-

emotional state was corroborated by the emails she sent Human Resources, her resignation letter, and other testimony at trial. The court explained that it used the "maximum recovery rule" to remit her damages to the "maximum amount that is supported by the evidence." See Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988). Additionally, the court's decision to set the amount at $200,000 is supported by awards in comparable cases. Although the jury may have been "generous," the district court did not abuse its discretion. See Monteagudo, 554 F.3d at 175; Koster, 181 F.3d at 34-35.

## C.   Motion for a New Trial Based on Evidentiary Rulings

We review an order denying a new trial for abuse of discretion. A new trial is warranted only "if the verdict, though rationally based in the evidence, was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice." Astro-Med, 591 F.3d at 13. We review the district court's evidentiary rulings for abuse of discretion. Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1158 (1st Cir. 1996).

DHL argues that Aponte introduced irrelevant and hearsay statements under the guise of refreshed recollections. While Aponte testified, her lawyer sought to establish that she received commendations at work prior to Frias's supervision beginning in 2004. To refresh her recollection of the commendations, her lawyer

-16-

showed her documents dating from 2001 to 2004.  See Fed. R. Evid. 612.

The district court did not abuse its discretion in allowing the documents to refresh Aponte's recollections.  Consistent with the requirements of Fed R. Evid. 612, the court ensured that DHL had copies of the documents, assured the documents were relevant to the case, allowed DHL to cross-examine Aponte regarding the recollections recorded, and instructed Aponte to testify to her own recollections and not hearsay.  Aponte's counsel instructed her, "Don't read the documents.  Just read the documents for yourself, and if that refreshes your recollection, tell the jury what . . . . did you do to receive the commendations?"  Aponte then described what she did to receive a commendation in each instance.

DHL next argues that the court erred by failing to give a curative instruction regarding certain comments Frias made to Aponte in 2004.  Aponte testified that Frias made two sexually suggestive comments that year:  (1) asking her "where one could party in San Juan"; and (2) inquiring whether she had not yet married because she was waiting for a man like him.  Because there was an 11-month period between these two comments and her remaining allegations of hostile work environment, the court determined the comments were sufficiently removed in time and sufficiently different in nature to sever them from her hostile work environment claim.  The court therefore instructed the jury:  "Yesterday the

-17-

plaintiff rested. After the plaintiff rested, I removed from the case the allegations of sexual statements. So the issue for you to decide is whether or not the . . . plaintiff was subjected to harassment in the work place."

Although the court could have been more specific about the "sexual statements" it was referring to, the curative instruction does not constitute an abuse of discretion. Even if the instruction should have been more specific, the error was harmless. See Moulton v. Rival Co., 116 F.3d 22, 26 (1st Cir. 1997). Aponte presented sufficient evidence of Frias's statements to support the jury's ultimate verdict regarding her hostile work environment claim.

Finally, DHL argues that the jury was confused by Aponte's testimony that she did not receive a promotion. Aponte's complaint originally included a claim for failure to promote, but the district court found that it was time-barred. Nonetheless, Aponte introduced evidence at trial that she was denied a promotion and that she felt compelled to resign due to the harassment she experienced. On appeal, DHL contends that this evidence was introduced in support of a constructive discharge claim that Aponte withdrew before the jury retired.[3] DHL claims that this sequence

_____

[3] It is unclear whether Aponte brought a constructive discharge claim. Pre-trial rulings suggest that the district court considered constructive discharge to have been pled, but at trial, Aponte denied bringing such a claim. In an excess of caution, the trial court agreed to "grant the directed verdict as to the claim

allowed Aponte to bring her time-barred claim before the jury through a back door, and contends that the court should have provided a curative instruction.

The court did not abuse its discretion in refusing DHL's requests to provide a curative instruction on this point. At the close of Aponte's case, the court stated:

> Members of the jury, this testimony concerning the promotion . . . is not part of the case for damages purposes. We're just going into the history of . . . the plaintiff with the company. So she's testifying that she did not get a promotion. That is not part of her case for which she's asking damages.

The court also told the jury that the case involved a claim of hostile work environment based on sex discrimination, and not constructive discharge. The court's statements to the jury belie DHL's claim that the jury was "undoubtedly confused."

**AFFIRMED.**

---

if there was one."