USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT No. 96-1089 JOAQUIM CONDE, Plaintiff, Appellee, v. STARLIGHT I, INC., Defendant, Appellant.  ____________________ No. 96-1209 JOAQUIM CONDE, Plaintiff, Appellant, v. STARLIGHT I, INC., Defendant, Appellee.  ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert B. Collings, U.S. Magistrate Judge] _____________________  ____________________ Before Cyr, Boudin and Lynch, Circuit Judges. ______________  ____________________ Thomas E. Clinton, with whom Kathleen B. Carr and Clinton & ___________________ __________________ _________ Muzyka, P.C. were on brief for Starlight I, Inc.  ____________ David F. Anderson, with whom Latti Associates was on brief for __________________ ________________ Joaquim Conde.   ____________________ January 9, 1997  ____________________ 2 CYR, Circuit Judge. Plaintiff-appellee Joaquim Conde CYR, Circuit Judge. _____________ sustained a permanent injury to his left hand on August 13, 1988, while serving as first mate aboard the commercial fishing vessel F/V ALENTEJO which was navigating in rough waters east of Nantucket on the Georges Bank.1 Two days after the accident, Edward Monteiro, an adjuster for the ALENTEJO's insurer, obtained an oral statement from Conde in Portuguese. Since Conde could speak little English and was unable to read it, Monteiro purport- ed to translate the written English statement back to Conde in Portuguese. Unbeknownst to Conde, the statement he signed indicated that the ALENTEJO had been travelling at slow speed when the accident occurred and it makes no mention of other critical facts about which Conde had informed Monteiro in his interview. For instance, the written statement omits any refer- ence to the captain's refusal to slow the vessel and lower the fishing net to deck-level so that Conde and his fellow worker would not have to stand on the slippery deck, from which tiles were missing, while repairing the net. In September 1990, Conde brought the present action for negligence and unseaworthiness against appellant Starlight I, Inc., owner of the ALENTEJO. See 46 U.S.C. 688 (Jones Act); ___ Miles v. Apex Marine Corp., 498 U.S. 19, 29 (1990) (unseaworthi- _____ _________________ ness). At trial, the defense relied heavily upon the apparent discrepancies between Conde's trial testimony and the written  ____________________ 1Almost six years later, Conde obtained a nonmaritime factory job at a reduced salary. 3 statement he unwittingly gave to Monteiro, the adjuster. Conde, on the other hand, contended that Starlight and Monteiro, antici- pating litigation, had collaborated to misrepresent the oral statement Conde made to Monteiro.  After the jury awarded Conde $350,000 in damages, the district court granted a new trial due to improper closing argument by Conde's counsel. The second trial resulted in a $968,500 award to Conde: $118,500 for past economic loss; $50,000 for pain and suffering; and $800,000 for future economic loss. The district court denied Starlight's second motion for new trial, subject to Conde's agreement to remit all damages for future economic loss above $254,212.50. On appeal, Starlight challenges both the denial of its second motion for new trial and the amount of the remittitur.2  I. Second Motion for New Trial I. Second Motion for New Trial ___________________________ Starlight contends that four improper statements by Conde's counsel in closing argument warrant yet a third trial. First, counsel observed, without evidentiary support, that Monteiro and defense attorney Thomas Clinton, Esquire, were "friends" and had "been working together for twenty years." Starlight argues that the veiled reference to possible collusion between Monteiro and Clinton was wholly immaterial and deliber- ately inflammatory. We find no abuse of discretion. See Ahern ___ _____  ____________________ 2Since we deny Starlight's appeal, we need not reach Conde's contingent cross-appeal from the district court order granting Starlight's first motion for new trial. We assume that Conde would opt for a reduced total remittitur of $364,736, rather than reinstatement of the first jury award (i.e., $350,000). 4 v. Scholz, 85 F.3d 774, 780 (1st Cir. 1996).  ______ Monteiro testified on redirect examination that he asked Conde to sign the August 15, 1988, statement in three places for Conde's own "protection," to prevent its alteration after it left Monteiro's possession. Later in his testimony, however, Monteiro admitted that he himself had given the state- ment directly to Thomas Clinton, Esquire, Starlight's counsel. When asked whether he had known Clinton well prior to August 1988, Monteiro acknowledged that they were on a "first-name basis," and had worked together previously.  We normally presume that a jury follows instructions to disregard improper argumentation. See Greer v. Miller, 483 U.S. ___ _____ ______ 756, 766 n.8 (1987); Sweeney v. Westvaco Co., 926 F.2d 29, 36 _______ ____________ (1st Cir.), cert. denied, 502 U.S. 899 (1991). So it is here. _____ ______ After Clinton objected to the remark by Conde's counsel in closing argument, the court promptly cautioned the jury that the evidence did not establish a "friendship" between Monteiro and Clinton. Moreover, Monteiro's business relationship with Clinton ________ ____________ was in evidence. Finally, the Monteiro-Clinton relationship was at least somewhat probative of the plausibility of Monteiro's testimony concerning why he considered it necessary that Conde sign the August 15, 1988, statement in three places.  Second, Starlight relies on a closing remark to the effect that the captain's consumption of several alcoholic beverages as late as the evening meal the day of the accident had impaired his judgment, and likely explained his negligent refusal 5 to slow the vessel and lower the net as Conde had requested. Although another fishing vessel captain testified that no vessel captain should consume alcohol while navigating a vessel, Star- light insists that it was necessary for Conde to adduce expert toxicological evidence as to how the particular level of alcohol consumption established by the evidence typically would impair human judgment.  The authorities cited by Starlight simply stand for the thesis that expert toxicological testimony may be used to estab- ___ lish the likely effects of alcohol. See Armand v. Louisiana ___ ______ _________ Power & Light Co., 482 So.2d 802, 804 (Ct. App. La. 1986) ("[A]ll _________________ experts agreed that .30% or .23% [blood alcohol] would impair the motor abilities and judgment of anyone."); see also People v. ___ ____ ______ Modesto, 427 P.2d 788, 790 (Cal.), cert. denied, 389 U.S. 1009 _______ _____ ______ (1967), overruled on other grounds, Maine v. Superior Court, 438 _________ __ _____ _______ _____ ______________ P.2d 372, 377 n.8 (Cal. 1968). These authorities in no manner suggest that such testimony is invariably required. Cf., e.g., ___ ____ United States v. Hillsberg, 812 F.2d 328, 333 (7th Cir.) ("The ______________ _________ jury would likely have little knowledge of the effects of mental diseases and defects. Laymen do have occasion, however, to learn the effects of alcohol."), cert. denied, 481 U.S. 1041 (1987).  _____ ______ Third, Starlight contends that repeated references to Monteiro as an "adjuster," during direct and redirect examination and in closing remarks by Conde's counsel, violated Federal Evidence Rule 411 ("Evidence that a person was or was not insured against liability is not admissible upon the issue whether the 6 person acted negligently or otherwise wrongfully."). We do not agree.  For one thing, Starlight did not object to Conde's repeated references to Monteiro as an "adjuster" throughout either the first or second trial. Thus, the tardiness of its objection calls into serious question whether the litigants, let alone the jury, inferred that Monteiro was an "insurance adjust- _________ er," cf., e.g., NLRB v. International Bhd. of Elec. Workers Local ___ ____ ____ _________________________________________ 340, 481 U.S. 573, 581 (1987) (union's "grievance adjuster or ___ collective bargainer"); Ferguson v. Skrupa, 372 U.S. 726, 732 ________ ______ (1963) ("debt adjuster"), let alone that Starlight carried liability insurance. In all events, Rule 411 does permit mention of insurance coverage, not to prove negligence, but collaterally to show the possible "bias or prejudice of a witness." See ___ Pinkham v. Burgess, 933 F.2d 1066, 1072 (1st Cir. 1991) ("Rule _______ _______ 411 itself contemplates that evidence that the defendant was insured may be admissible on issues other than negligence."); Charter v. Chleborad, 551 F.2d 246, 248 (8th Cir.) ("[T]he fact _______ _________ that defendant's insurer employed [a witness] was clearly admis- sible to show possible bias of that witness."), cert. denied, 434 _____ ______ U.S. 856 (1977). Starlight's entire defense centered on Monteiro's credibility in regard to the authenticity of his "translation" of Conde's August 15, 1988 statement. Finally, Starlight argues that Conde's attorney once again argued facts not in evidence, and invited the jury to engage in rank speculation, by noting that the captain might have 7 been steaming the ALENTEJO full speed ahead in an attempt to flee Canadian waters before Canadian patrol boats detected the vessel. On the contrary, according to Starlight's own expert, based on a reverse extrapolation of its known course immediately after the accident, the ALENTEJO probably had been on the Canadian side of the Hague Line just prior to the accident. This circumstantial evidence combined powerfully with the captain's own testimony that he previously served aboard a fishing vessel seized by a Canadian patrol boat and that he knew on August 13, 1988 that the same Canadian patrol boat was within one-half mile of the ALENTEJO. II. The Remittitur II. The Remittitur ______________ Starlight claims that the trial court miscalculated the remittitur at $254,212.50.3 Starlight first projects a total future economic loss as low as $27,199, by using Conde's 1987 income, rather than the higher 1988 income figure, for arriving at a base annual salary. As Conde was injured in mid-August, 1988, however, the jury reasonably could have looked to Conde's higher 1988 income projection as a more accurate reflection of his future earning power than the 1987 income. See Eastern ___ _______ Mountain Platform Tennis, Inc. v. Sherwin-Williams Co., 40 F.3d _______________________________ _____________________ 492, 502 (1st Cir. 1994) (in ruling on remittitur motion, court examines evidence "in the light most favorable to the prevailing party"); see also Jones & Laughlin Steel Corp. v. Pfeifer, 462 ___ ____ _____________________________ _______  ____________________ 3Once a district court has decided to exercise its discre- tion to grant a remittitur, appellant "must show . . . that the reduced figure remains so extravagant as to shock the appellate conscience." Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 724 _______ ____________________ (1st Cir. 1994). 8 U.S. 523, 538 (1983) ("It is both easier and more precise to discount the entire lost stream of earnings back to the date of injury -- the moment from which earning capacity was im- paired.").4 Starlight next argues that the 3% per annum adjustment for inflation in "non-agricultural" workers' wages from 1988 to 1995 (i.e., 20.25% in aggregate) was excessive because a commer- ____ cial fisherman would not be classified as a "non-agricultural worker" and recent federal restrictions upon commercial fishing on Georges Bank have depressed fishermen's wages. Starlight offers no evidentiary support for its contention that a commer- cial fisherman would not qualify as a "non-agricultural" worker (i.e., one who does not cultivate land) for purposes of the 1995 ____ Economic Report of the President, which the parties otherwise stipulated as a source of the applicable "non-agricultural" inflation rate. Nor did Starlight adduce any evidence as to how its suggested offset to the stipulated inflation rate should be calculated. We therefore conclude that it has failed to demonstrate any "conscience-shocking" adjustment in calculating an inflation rate. See supra note 3.  ___ _____ Finally, Starlight argues that the trial court used the $118,500 jury award for past economic loss to calculate the  ____________________ 4Although Conde earned $35,930 in gross income during 1987, he incurred extraordinary unreimbursed work expenses ($19,404) which effectively reduced his annual income to only $16,526. See ___ Jones & Laughlin, 462 U.S. at 534 (recommending that unreimbursed ________________ work expenses be deducted before estimating future lost stream of income). This figure is substantially lower than Conde's pro- jected 1988 gross income of $22,332. See infra note 7.  ___ _____ 9 relevant "base year" salary (i.e., Conde's lost income for 1995) ____ with which to extrapolate his future (i.e., post-1995) economic ____ loss, rather than predicating the base figure calculation direct- ly on the trial evidence.5 Although neither we nor the parties have been able to reconstruct the exact mathematical calculations utilized by the district court,6 the trial evidence, viewed in the light most favorable to Conde, would yield an approximate  ____________________ 5The court explained its methodology as follows:  In determining the figure to which to remit the award for loss of future earning capacity, I shall endeavor to arrive at the maximum figure which the jury could have awarded using as a guide the amount the jury awarded the plaintiff for lost wages from the date of the accident to the date of the verdict, i.e., $118,500. For this purpose, I shall assume the jury, in arriving at the $118,500 figure, deducted an amount for what was earned and what could have been earned after the plaintiff reached an end medical result. I shall also take into account the fact that the wages of non-agricultural workers from 1988 to 1995 rose approx- imately 3% a year or 20.25% over the entire period. After making these adjustments, what results is a figure of expected earnings for 1995 in the amount of $29,020. I shall then apply a reduction of 20% for taxes and a 1% discount rate to arrive at the amount the plaintiff would have earned over the 26 year period of his work expectancy reduced to present value. Using this methodology, the result is $254,212.[50]. (Foot- notes omitted.) 6As future loss calculations are multiplex, effective appel- late review may be greatly inhibited by any lack of particularity in the trial court's methodology. Given these latent ambigu- ities, we could remand to the district court for clarification, see Jones & Laughlin, 462 U.S. at 546, 552 (refusing invitation ___ ________________ to adopt one calculation methodology as "the exclusive method"), but for reasons of judicial economy we opt to calculate the maximum future economic loss based directly on the evidence before the jury. See infra note 7. ___ _____ 10 discounted future economic loss of $196,236.7  The unknowable and unquantifiable factors involved in calculating a future stream of lost income (e.g., future infla- ____ tion rates; actual work life), militate against "a search for 'delusive exactness,'" since "[i]t is perfectly obvious that the most detailed inquiry can at best produce an approximate result." Jones & Laughlin, 462 U.S. at 546, 552. Even viewing the trial _________________ evidence most generously to Conde, however, the $254,212.50 award for future economic loss effectively disregards a significant and practicably quantifiable factor: the need to reduce future economic loss to present value, even if only by the most conser- vative discount figure (1%), see supra note 7, particularly since ___ _____ the parties stipulated below that some "present value" reduction __________ would be appropriate, albeit reserving the precise discount rate  ____________________ 7Viewing the evidence most favorably to Conde, the alterna- tive remittitur amounts would work out as follows:  Annual gross income from 1/88 to 8/88 $ 14,106 Extrapolated income from 8/88 to 12/88 + 8,816 Unreimbursed work expenses - 590 ______ Total projected gross income for 1988 22,332 Inflation rate between 1988-95 (20.25) + 4,522 ______ Adjusted projected annual gross income (1995) 26,854 Actual gross income for factory job (1995) - 15,080 ______ Total loss of annual gross income (1995) 11,774 Taxes on lost income (@ 1988 rate of 16.97%) - 1,998 ______ Net annual lost income (1995) 9,776 Remaining work life in 1995 (26 years) x 26 ______ Total lost future income stream 254,176 Discounted to present value (@ 1%) 196,236 Discounted to present value (@ 2%) 151,890 Discounted to present value (@ 3%) 117,860 Although the $254,212.50 remittitur calculated by the district court purportedly factored in a 1% discount rate, see ___ infra note 8, it actually approximates our pre-discount amount of _____ ___ $254,176. 11 (1% or 2%). Cf. id. at 548 (noting that use of discount rate ___ ___ between 1% and 3% in Jones Act case would not be an abuse of discretion).8 III. Conclusion III. Conclusion __________ Given these somewhat less "elusive" circumstances, we conclude that the 30% discrepancy between the $254,212.50 and the $196,236 economic-loss figures is sufficiently quantifiable and substantial that it ought not stand. Sanchez v. Puerto Rico Oil _______ _______________ Co., 37 F.3d 712, 724 (1st Cir. 1994); cf. Jones & Laughlin, 462 ___ ___ ________________ U.S. at 552 (noting that jury awards for pain and suffering are "highly impressionistic"); Ruiz v. Gonzalez Caraballo, 929 F.2d ____ __________________ 31, 34 (1st Cir. 1991) ("After all, '[t]ranslating legal damage [viz., physical effects of post-traumatic stress syndrome] into ____ money damages -- especially in cases which involve few signifi- cant items of measurable economic loss -- is a matter peculiarly  ____________________ 8Using a "market interest" rate (e.g., 6%) to reduce a ____ future-earnings award to present value recognizes that, at least in an inflation-free economy, the plaintiff's immediate accession to a lump-sum award would enable him to earn interest by rein- vestment, an opportunity not available to him had the same amount been earned incrementally over time. See Jones & Laughlin, 462 ___ _________________ U.S. at 536-37 n.20 ("present value" reduction premised on plaintiff's duty to mitigate damages). In an inflationary economy, however, a discount rate (or offset) below the "market interest" rate (e.g., 1 or 2%, instead of 6%) may be used, ____ because even though Conde did not adduce specific evidence from which to forecast actual inflation rates in future years, it nonetheless may be presumed that anticipated future inflationary trends will tend to curtail investment returns at levels below the market rate. Id. at 538-39. Although the Supreme Court has ___ declined to mandate a single "present value" reduction or a single discount methodology for use in all Jones Act damages calculations, see id. at 550, absent extraordinary circumstances ___ ___ the factfinder normally should essay some measure of "present ____ value" reduction.  12 within a jury's ken.'") (quoting Wagenmann v. Adams, 829 F.2d _________ _____ 196, 215 (1st Cir. 1987)). Accordingly, we direct a further remittitur. See Kolb v. Goldring, Inc., 694 F.2d 869, 875 (1st ___ ____ ______________ Cir. 1982) (appellate court may order a new trial, in the event claimant rejects further remittitur, where trial court error in calculating remittitur was clear and mere "mechanical" correction is required) (citing Stapleton v. Kawasaki Heavy Indus., 608 F.2d _________ _____________________ 571, 574 n.7 (5th Cir. 1979)); Everett v. S.H. Parks & Assocs., _______ ______________________ Inc., 697 F.2d 250, 253 (8th Cir. 1983).  ____ The district court ruling denying defendant-appellant's The district court ruling denying defendant-appellant's _______________________________________________________ motion for new trial is affirmed. The remittitur for future motion for new trial is affirmed. The remittitur for future _________________________________________________________________ economic loss is further reduced to $196,236. Upon remand, the economic loss is further reduced to $196,236. Upon remand, the _________________________________________________________________ district court should fix an appropriate time within which plain- district court should fix an appropriate time within which plain- _________________________________________________________________ tiff-appellee must either accept the revised remittitur or submit tiff-appellee must either accept the revised remittitur or submit _________________________________________________________________ to a new trial on damages for future economic loss. The parties to a new trial on damages for future economic loss. The parties _________________________________________________________________ shall bear their own costs.  shall bear their own costs. __________________________ SO ORDERED. SO ORDERED. __________ 13