# United States Court of Appeals
## For the First Circuit

No. 23-1652

MICHELE TOURANGEAU,

Plaintiff, Appellant,

v.

NAPPI DISTRIBUTORS,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Danielle Quinlan, with whom Laura H. White and White &
Quinlan, LLC were on brief, for appellant Michele Tourangeau.
John J. Wall, III, with whom Laura A. Maher and Monaghan
Leahy, LLP were on brief, for appellee Nappi Distributors.

July 25, 2024

**BARRON**, **Chief Judge**.  Michele Tourangeau moved for a new trial after a jury delivered a verdict in favor of her former employer, a beer and wine distributor, on eight employment-related claims that she brought against the company in the United States District Court for the District of Maine.  She now challenges the motion's denial.  We affirm.

**I.**

On January 10, 2020, Tourangeau filed a complaint against Nappi Distributors ("Nappi") in the District of Maine that set forth nine employment-related claims.  More than a year later, Nappi moved for summary judgment on all the claims.

The District Court denied the motion as to all but one of the claims, and a jury trial ensued.  The jury ultimately delivered a verdict in favor of Nappi on each claim.

Tourangeau thereafter filed a motion for a new trial pursuant to Federal Rule of Civil Procedure 59(a) on all the claims based on allegations of juror bias and, more narrowly, on one of the two claims that Tourangeau had brought under the federal Equal Pay Act ("EPA"), 29 U.S.C. § 206 et seq.  This latter portion of the motion argued that a new trial was warranted both because the District Court had erred in failing to give a jury instruction that Tourangeau had requested and because the jury's verdict was against the great weight of the evidence and contrary to law.

The District Court rejected Tourangeau's motion for a new trial in its entirety.  See Tourangeau v. Nappi Distribs., No. 20-cv-00012, 2023 WL 4597031, at *1 (D. Me. July 18, 2023). Tourangeau timely appealed.[1]

## II.

We start with Tourangeau's challenge to the District Court's denial of the portion of her motion for a new trial that alleged "the unusual circumstances of this case indicated such overwhelming juror bias that a miscarriage of justice has occurred."  This challenge focuses on the District Court's rejection of her arguments concerning the alleged bias of one of the empaneled jurors, Juror 161.[2]  We first set forth the relevant facts and procedural history and then explain why the challenge fails.

---

[1] Tourangeau's notice of appeal also states that she is appealing the aspect of the District Court's final judgment that relates to its "Order on Plaintiff's Motion for Equitable Relief." Her opening brief, however, does not mention any argument as to any order relating to equitable relief, and we accordingly deem any such argument waived.  See Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 239 (1st Cir. 2013) ("[A]rguments not raised in an opening brief are waived.").

[2] On appeal, Tourangeau's opening brief also contends that the District Court abused its discretion by dismissing Juror 14 while empaneling Juror 89.  However, Tourangeau agreed in her reply brief to "dismiss and dispense" with that contention.

- 3 -

**A.**

**1.**

Before the fourth day of trial began, Tourangeau filed a motion to disqualify Juror 161. The motion started by noting that, "[o]n the record and prior to jury selection, the parties agreed that any juror who answered 'YES' to questions 7 or 8" of the written juror questionnaire that prospective jurors were required to fill out "should be automatically disqualified from the jury pool." The two questions were:

> 7. The law protects against discrimination of individuals with certain medical conditions, including a woman's pregnancy. Do you have any strong feelings or philosophical beliefs about such laws that might interfere with your ability to be fair and impartial in a case in which the laws might apply?
>
> 8. Do you have any strong personal feelings or philosophical beliefs about an individual's ability to bring a lawsuit to recover money damages that might interfere with your ability to be a neutral impartial decision-maker in a case in which a person is seeking money damages?

The motion asserted that, because Juror 161 did not answer "yes" to either question, Tourangeau "had no ability to question this juror on any bias prejudicial beliefs." The motion further stated that, "[b]ased on the conduct, demeanor, and utterances of Juror Number 161 over the first several days of trial, [Tourangeau] has a good faith belief that Juror Number 161 harbors discriminatory animus, bias, and prejudice that should

- 4 -

disqualify him from further service." The motion went on to state that, "[b]ased on Juror Number 161's Facebook interests, it appears that he lied on his written juror questionnaire" and that "Juror 161's conduct has caused Plaintiff to conclude that he may harbor intense bias that was undisclosed during the written questionnaire and voir dire process."

As supporting authority, the motion invoked an earlier ruling from the District of Maine in United States v. French ("French I"), No. 12-cr-00160, 2016 U.S. Dist. LEXIS 195123 (D. Me. Nov. 16, 2016). There, the same judge presiding in Tourangeau's case had denied a motion for a new trial based on the alleged failure of a juror honestly to have answered a question posed at voir dire. See id. at *65.[3]

Tourangeau's motion also represented that her counsel "observed and heard Juror Number 161 making biased utterances, rolling his eyes, and exhibiting obvious disdain for testimony presented by [Tourangeau]." "Specifically," the motion elaborated, "Juror 161 appeared to scoff at -- and entirely disregard -- testimony about a former Nappi" manager's statement

---

[3] On appeal, we vacated the denial and remanded for further proceedings after concluding that the motion had "presented a 'colorable or plausible' claim of the type of juror misconduct that could require a new trial" and that the "district court was therefore required to do more before ruling on the new trial motion." United States v. French ("French II"), 904 F.3d 111, 120 (1st Cir. 2018).

- 5 -

to the testifying witness that "we don't hire women" because "you just have to cover their route when they go out on maternity leave."

The motion further asserted that Tourangeau's counsel had "conducted research and found that Juror Number 161 is part of a secret Facebook group called [100 Percent FED Up]" whose Facebook page stated: "This is America's page. This is the #fedup movement. Share your ideas on how we can come together for change and resistance against the liberal/democratic/socialist agenda. Let them hear our voices!" According to the motion, the Facebook page "liked by Juror Number 161 appears distinctly opposed to the rights of women and all other minority groups," and that, "[b]ased on Juror Number 161's participation in the [100 Percent FED Up] Facebook group, it is clear that he should have answered in the affirmative to question 7 or 8 of the written questionnaire, and thus he should have been automatically eliminated from the jury pool." The motion then stated that, "[f]or these reasons, Plaintiff seeks to exclude and/or disqualify this juror from further participation in the trial of this matter."

**2.**

In denying Tourangeau's motion to disqualify Juror 161, the District Court acknowledged that, under United States v. Tucker, 61 F.4th 194 (1st Cir. 2023), it had a "duty to investigate an allegation of jury taint promptly," as well as duties to

determine "whether a taint-producing event actually occurred," the "extent or pervasiveness of the resulting prejudice," and to "consider possible measures to alleviate that prejudice." Id. at 202 (cleaned up) (quoting United States v. Therrien, 847 F.3d 9, 17 (1st Cir. 2017)). The District Court also noted that, under our decision in French II, "[t]o obtain a disqualification, the person seeking disqualification must present a 'colorable or plausible' claim that juror misconduct has occurred" (quoting French II, 904 F.3d at 117).

The District Court determined, however, that Questions 7 and 8 "d[id] not ask the juror to reveal facts." Rather, the District Court explained, those questions "ask[ed] the juror to reveal his opinions and they ask[ed] his opinion about whether or not he could be fair and impartial in those two types of cases" to which Questions 7 and 8 referred. The District Court also pointed out that Juror 161 had "responded that in his view he would not be biased."

The District Court explained that these features of Tourangeau's case distinguished the voir dire here from that in French II, because the juror in that case had been asked "a specific factual question, she denied it, and it turned out that she had lied." The District Court noted that, by contrast, "it's hard to delve into an opinion about one's own ability to be fair

and impartial and conclude, unlike in French, that . . . the juror has lied."

In so concluding, the District Court explained that the evidence failed to show that Juror 161 had lied on Questions 7 and 8. "I have looked at the [Facebook page]; I don't really see a connection between the [page]" and Question 7, the District Court explained. That was so, according to the District Court, because Question 7 asked "whether or not a juror could be fair about a case that involves a medical condition involving pregnancy." The District Court then explained that, as to Question 8, the questionnaire had asked "about a person bringing a lawsuit. It's not specific about women. It's not specific about discrimination. It's not specific about unequal pay. So I don't think this is like French in that regard."

The District Court did acknowledge that Juror 161 had liked the Facebook page in question. But the District Court explained that "I think I can draw a conclusion perhaps that when the juror liked the [page] I could draw an inference that he is a conservative . . . but I can't draw a conclusion about what he liked about it."

The District Court pointed out that there are "all sorts of different postings [from the 100 Percent FED Up page] that have been made available to me and I'm not sure what he liked. I don't know what was in his mind." Indeed, the District Court noted,

- 8 -

"the fact that he liked [100 Percent FED Up] does not mean he necessarily adopts all the postings on the [page]." Thus, the District Court concluded, "I don't think it's true that we can draw a conclusion that it would be a fair inference to conclude that because he likes a website with conservative political views that he could not be a fair and impartial juror here."

The District Court also explained that the present case did not involve a "situation that allows me very much flexibility in terms of bringing the juror in and questioning him." The District Court reasoned that, "unlike the juror in the French case where you could bring her in and say[,] you answered this, why did you answer it, and isn't it true that it wasn't true, what we're going to be doing here is bringing him in and . . . questioning him about his political views." The District Court explained its fear that, "once I start down that road with him we can almost be assured he will not be a fair and impartial juror" because "he'll have been hauled in by the judge and questioned about his political views and asked whether or not he can be fair and impartial given the fact he is a conservative." The District Court further explained, "if I find that he says he can be fair and impartial and I send him back, he is going to be angry, and rightfully so."

The District Court noted that it was "concerned about the implications for other cases here." Specifically, the District Court reasoned that "[t]his is an area of Maine . . . [with] a lot

of people who have progressive viewpoints, which I think we ought to honor just as we honor people with other viewpoints." The District Court then stated that "I don't think there is any reason to disqualify progressive jurors on the assumption they can't be fair and impartial.  I think they can.  I think conservatives can be fair and impartial."  Indeed, the District Court continued, "I don't jump the -- the causal link between someone having political views, sometimes strong political views, and an inability to be a fair and impartial juror."

Finally, the District Court turned to Tourangeau's contentions regarding Juror 161's alleged demeanor and conduct during the first days of the trial.  The District Court explained that "I haven't heard -- I can't hear [Juror 161], so I don't know that he has scoffed as has been represented."  The District Court acknowledged that Juror 161 "occasionally will look up as if he is sort of frustrated," but the District Court explained that "I haven't noticed that he has been doing that at any particular time. . . . [H]e doesn't look up more when [defense counsel] is asking questions as opposed to the plaintiff asking questions."  The District Court then stated, "[s]o I'm not convinced, from what I have seen here, that [Juror 161] has exhibited body language and an attitude that would render him disqualified."  The District Court concluded that "for all those reasons I'm going to deny the motion; I'm going to keep him in as a juror."

**3.**

After the jury rendered a verdict in favor of Nappi, Tourangeau filed a motion for a new trial based in part on Juror 161 having "displayed such bias, hostility, and false responses to voir dire that his presence tainted the entire jury pool against plaintiff." In support of this argument, the motion first referenced the allegations made in the earlier motion to disqualify the juror about the juror's "scoffing." The motion asserted that "[c]ounsel heard Juror Number 161 repeatedly scoffing at Plaintiff's table during trial, in a manner that was unmistakably hateful and laden with disgust toward Plaintiff or her attorneys" and that the juror "rolled his eyes at Plaintiff and her counsel." The motion argued that, in doing so, the juror was "exhibiting obvious disdain for testimony presented by Plaintiff."

The motion also recounted that Tourangeau's counsel "researched Juror Number 161's Facebook page," which "revealed that Juror Number 161 'liked'" the 100 Percent FED Up page. The motion then asserted that, based on the page's content and the juror having liked the page, "[t]here could not be a more glaring example of an individual that Plaintiff would want to strike for cause than Juror Number 161, if only he had answered the jury questionnaire or general voir dire truthfully."

Moreover, the motion renewed the contention in the motion to disqualify about the juror having lied by answering "no"

to Questions 7 and 8 on the written juror questionnaire. But, in addition, the motion for a new trial raised a new contention about how Juror 161 had been dishonest during voir dire.

Here, the motion focused on the juror's response to two questions that the Magistrate Judge had asked prospective jurors.[4] The two questions were:

> Have any of you, members of the jury, ever been a member of an organization that has advocated on topics relevant to women's rights or gender-related issues?

> Have you ever been a member of any organization who has advocated regarding . . . women's rights or gender-related – or gender-equity-related . . . issues? If so, I ask that you stand.

The motion asserted that the "clear intent of these voir dire questions was to ascertain whether a prospective juror had strong feelings, positive or negative, about 'topics relevant to women's rights or gender-related issues.'" Furthermore, the motion explained, "[t]o argue otherwise, for instance that this voir dire question sought only to elicit potential jurors who believed in women's rights, would itself establish reversible error." Yet, the motion asserted, although the Magistrate Judge had asked prospective jurors to stand if their answer to either

---

[4] Tourangeau explains that she did not advance this challenge earlier, because "[w]hen the parties briefed and argued the disqualification issue" at trial "the transcript from jury selection was not available."

- 12 -

question was "Yes," Juror 161 had not done so even though he had liked the Facebook page in question.

The motion anticipated that Nappi would argue in response that "membership in an 'organization' does not extend to 'likes' on a social media page like Facebook" and thus that Juror 161 had not responded falsely to either question. The motion countered that "this argument would be inconsistent with the digital world we live in, where 'membership' in a group is much more likely to occur online." The motion therefore argued that "[t]here is simply no rational basis to conclude that a juror who 'likes' a group harboring intense bias against women's rights and discrimination claims is not associated with an 'organization' that advocates on topics relevant to gender equality."

The motion for a new trial separately advanced one other new allegation concerning Juror 161's bias. After the trial had ended, the motion asserted, Juror 161 had "unliked" the Facebook page at issue. The motion speculated that the fact that the juror had done so indicated that someone from Nappi "contacted the Juror to tell him to remove this 'like' from his page." The motion then wound up this argument for the District Court having erred in denying the motion for a new trial as follows: "Given the unusual circumstances of this case, Juror Number 161 should be questioned by the Court about why and when he 'unliked' the [100 Percent FED

Up] Facebook page. Alternatively, the Court should order a new trial."

To support the argument that "the Court should have questioned Juror Number 161 on his affiliation with [100 Percent FED Up] and his responses to Questions Number 7 and 8," the motion for a new trial invoked the French II standard for "determining whether a party should be granted a new trial based on juror dishonesty." The motion also explained that, "[u]nder [Tucker], the court has an obligation to investigate juror dishonesty." The motion did acknowledge the District Court's concern about the "risk of creating further bias" from bringing Juror 161 in for questioning, but the motion argued that "the Court erred by concluding that Juror Number 161's responses to Question 7 and 8 were not 'factual' in nature." The motion also contended that "disqualification of this juror would not have been problematic because alternates existed."

Finally, the motion reprised Tourangeau's argument from her motion to disqualify Juror 161 based on the juror's alleged scoffing and eye-rolling during the trial. But the motion did not stop there, as it also alleged that, "[e]ven more concerning, when the verdict was read in favor of Defendant and against Plaintiff, Juror Number 161 smirked and took such obvious pleasure in finding against Tourangeau that his bias was unmistakable." The motion concluded, "[f]or all of these reasons, as well as Juror Number

- 14 -

161's failure to respond honestly to oral voir dire, a miscarriage of justice has occurred and a new trial must be granted."

**4.**

In denying the motion for a new trial insofar as it was based on Juror 161's alleged eye-rolling and scoffing, the District Court relied on the determinations that it had made in rejecting Tourangeau's motion to disqualify the juror. See Tourangeau, 2023 WL 4597031, at *32. The District Court explained that it had determined at that time that, although Juror 161 "occasionally will look up as if he is sort of frustrated," Juror 161 "doesn't look up more when [the defendant] is asking questions as opposed to the plaintiff asking questions." Id. The District Court also noted that the "Court stated that it could not hear Juror Number 161 and therefore did not know if he had ever 'scoffed.'" Id. at *29. The District Court then concluded that it "again agrees with its prior analysis and concludes that Juror 161 did not exhibit behavior sufficient to require disqualification or questioning," for, "[a]s the record now stands, there is no evidence supporting counsels' assertions that this juror engaged in inappropriate facial expressions and verbal conduct." Id. at *32. Indeed, the District Court asserted, "[i]n essence, the Court is left with argument without evidence." Id.

As to the arguments concerning Juror 161's assertedly dishonest answers to the written questionnaire, the District Court

- 15 -

explained that, with respect to Question 7 of the voir dire questionnaire, "the fact that Juror Number 161 liked the [100 Percent FED Up] page -- absent other substantiated evidence -- does not prove that the juror holds strong feelings or philosophical beliefs about pregnancy." Id. at *31. The District Court then similarly concluded as to Question 8 that Juror 161's "liking" the Facebook page provided no basis to conclude that he would be "biased in all lawsuits brought to recover money damages." Id.

With respect to Juror 161's failure to stand in response to the Magistrate Judge's questions, the District Court determined that the juror's failure to do so did not show that the juror had lied, because there was no evidence that Juror 161 had joined the organization that "sponsored" the Facebook page at issue. Id. at *32. And finally, as to Juror 161's alleged "unliking" of the Facebook page, the District Court explained that Tourangeau "provides no legal support indicating that it would be proper for the Court to" question or disqualify Juror 161 on this basis. Id. at *32 n.9. Moreover, the District Court explained that, regardless of why Juror 161 "unliked" the Facebook page, Juror 161 did not display "such bias, hostility, and false responses to voir dire that his presence tainted the entire jury pool against plaintiff." Id.

- 16 -

On appeal, Tourangeau argues that the District Court's "failure to investigate dishonesty or bias regarding" Juror 161 "warrant[s] remand for further proceedings." Tourangeau does so by reprising -- almost verbatim -- the arguments in her motion for a new trial. She does, however, assert that, even if the juror need not have been disqualified, the District Court's "error regarding Juror 161 was not about the conclusion that Juror 161's responses were factual in nature. The error was that the district court failed to assess whether a 'colorable or plausible' showing of juror bias was made by Tourangeau." Thus, she contends, the "mere fact that Plaintiff raised palpable, audible, and visible conduct on the part of this juror suggesting bias required the district court to investigate further. The failure to do so, especially given the Facebook content cited above, was reversible error."

"A district court's refusal to order a new trial under Rule 59(a) is reviewed for abuse of discretion," Crowe v. Marchand, 506 F.3d 13, 19 (1st Cir. 2007), and we similarly "review claims that a trial court failed to conduct an appropriate inquiry into allegations of jury taint for abuse of discretion." United States v. French ("French III"), 977 F.3d 114, 121 (1st Cir. 2020) (quoting United States v. Paniagua-Ramos, 251 F.3d 242, 249 (1st Cir. 2001)). "Abuse of discretion occurs when our appellate review

reveals that the district court erred in its legal rulings or clearly erred in its factual findings." <u>Faria</u> v. <u>Harleysville Worcester Ins. Co.</u>, 852 F.3d 87, 90 (1st Cir. 2017).

Once there is a "colorable claim of juror bias, the district court has a duty to investigate." <u>French II</u>, 904 F.3d at 121. However, "while a trial court has an unflagging duty adequately to probe a nonfrivolous claim of jury taint, the court has wide discretion to determine the scope of the resulting inquiry and the mode and manner in which it will be conducted." <u>Paniagua-Ramos</u>, 251 F.3d at 250 (internal citations omitted). "The trial [court] may, but need not, convene a full[-]blown evidentiary hearing. Rather, [its] primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." <u>United States</u> v. <u>Boylan</u>, 898 F.2d 230, 258 (1st Cir. 1990) (internal citations omitted). We conclude that that there was no abuse of discretion here.

## 1.

We start with Tourangeau's assertion on appeal that the "mere fact that Plaintiff raised palpable, audible, and visible conduct on the part of this juror suggesting bias required the district court to investigate further." We review the District Court's "determination of jury impartiality with 'special deference'" because "the trial court observes the demeanor and

- 18 -

reactions of the prospective jurors." United States v. Sherman, 551 F.3d 45, 51 (1st Cir. 2008) (quoting United States v. Moreno Morales, 815 F.2d 725, 733 (1st. Cir. 1987)). Moreover, as Tourangeau herself acknowledges, a district court has "wide discretion to determine the scope of the . . . inquiry" into nonfrivolous allegations of juror bias "and the mode and manner in which [the inquiry] will be conducted." Paniagua-Ramos, 251 F.3d at 250. As a result, a district court is not necessarily obliged to hold an evidentiary hearing to assess allegations of juror bias, because "[its] primary obligation is to fashion a responsible procedure for ascertaining whether misconduct actually occurred and if so, whether it was prejudicial." Boylan, 898 F.2d at 258.

Against this backdrop, we see no basis for concluding that the District Court abused its discretion in ruling as it did as to Tourangeau's alleged eye-rolling and scoffing. The District Court set forth its own assessment of Juror 161's conduct based on its own observations of how the juror had behaved during the relevant periods. Tourangeau points to nothing in the record that so calls that assessment into question that we could deem the District Court's decision to proceed as it did at trial with respect to this juror an abuse of discretion.

**2.**

We next consider Tourangeau's contentions regarding Juror 161 having lied in answering the written juror questionnaire,

given Juror 161's "liking" of the Facebook page at issue. There is no evidence in the record that Juror 161 "liked" any specific post that appeared on the page, and none of the posts that Tourangeau identifies concern (as Question 7 did) "laws that protect against discrimination of individuals with certain medical conditions." Nor do any of those posts concern (as Question 8 did) "lawsuits brought to recover money damages." We thus see no basis for concluding that the District Court was obliged to probe Juror 161's answers to these questions on the ground that the answers that the juror gave to them were false.

French II accords with this conclusion. As the District Court explained, the issue in that case "was whether a juror had truthfully answered a specific factual question." Tourangeau, 2023 WL 4597031, at *31 n.7. French II concluded that a juror likely had been dishonest in responding "n/a" to the question, "[p]lease describe briefly any court matter in which you or a close family member were involved as a plaintiff, defendant, witness, complaining witness or a victim," because the juror's "son had indeed been convicted of marijuana and other drug-related offenses multiple times." French II, 904 F.3d at 115-17. Here, however, Question 7 ultimately required Juror 161 to make a personal judgment about whether any strong feelings or beliefs that he may have had would "interfere with [his] ability to be fair and impartial in a case in which the laws might apply," while Question

- 20 -

8 required Juror 161 to make a personal judgment about whether any strong feelings or beliefs that he may have had would "interfere with [his] ability to be a neutral impartial decision-maker in a case in which a person is seeking money damages." Tourangeau, 2023 WL 4597031, at *30 n.6. Thus, those two questions -- unlike the question at issue in French II -- required "delv[ing] into an opinion about one's own ability to be fair and impartial." Id. at *31.

### 3.

Tourangeau appears also to be contending on appeal that, given the content of the posts on the Facebook page that Juror 161 "liked," the District Court had a duty to question that juror about the juror's possible bias even if the juror's written answers to Question 7 and 8 were not false. Even Tourangeau acknowledges, however, that the District Court "understandably concluded that the situation . . . regarding Juror 161 was not one that allowed much flexibility 'in terms of bringing the juror in and questioning him,' because the risk of creating further bias was significant." Moreover, the only legal authorities that Tourangeau cites in support of her contention about the District Court's failure to carry out its duty to question Juror 161 are the French cases, which are distinguishable, and Tucker, which Tourangeau makes no attempt to apply to the facts of her case, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). We thus see no basis for

- 21 -

concluding that the District Court abused its discretion insofar as Tourangeau relies on this ground for granting the motion for a new trial.

**4.**

Insofar as Tourangeau separately challenges the denial of her motion for a new trial based on Juror 161's failure to stand in response to two of the Magistrate Judge's questions, we also are unpersuaded. The two questions specifically asked if the juror had ever been a "member of any organization" (emphasis added). But, as the District Court noted, there is no evidence in the record that Juror 161 "actually joined any of the organizations that were the subject of the Magistrate Judge's question," as we agree with the District Court that Tourangeau "presented no evidence that by 'liking' a Facebook page, an individual becomes a member of the organization that sponsored the page." Tourangeau, 2023 WL 4597031, at *32.

Tourangeau does assert that "[t]here is simply no rational basis to conclude that a juror who 'likes' a group harboring intense bias against women's rights and discrimination claims is not associated with an 'organization' that advocates on topics relevant to gender equality" (emphasis added). But Tourangeau develops no argument for why "association" with an organization constitutes "membership" such that, by failing to stand, Juror 161 responded falsely to the Magistrate Judge's

- 22 -

questions. Accordingly, we reject Tourangeau's challenge on appeal as it relates to Juror 161's failure to stand in response to the Magistrate Judge's questions.

**5.**

Finally, we must address Tourangeau's contention regarding Juror 161's alleged "unliking" of the Facebook page in question. But here, too, we see no basis for second-guessing the District Court.

The District Court explained in denying Tourangeau's motion for a new trial that Tourangeau "provides no legal support indicating that it would be proper for the Court to" disqualify Juror 161 on this basis. Id. at *32 n.9. And while Tourangeau repeats her argument on appeal in challenging that ruling, she fails to point to any legal authority or to develop any argument that would permit us to find error in the District Court's conclusion. See Zannino, 895 F.2d at 17.

**III.**

We come, then, to Tourangeau's challenges to the denial of the more narrow-gauged portion of her motion for a new trial. Here, she takes aim at only the jury's verdict as to one of her two EPA claims. Specifically, Tourangeau contends in this challenge that the District Court's denial of the motion was an abuse of discretion because (1) the District Court erred at trial in not giving an instruction to the jury that Tourangeau had

requested; and (2) the jury's verdict as to this claim "was contrary to the law and against the great weight of the evidence under the [EPA]."  We start with the latter contention before circling back to the contention regarding the failure to give the jury instruction.

### A.

"Where the trial judge has denied a motion for a new trial on the issue of the sufficiency of the evidence, it is 'only in a very unusual case that we will reverse such a ruling as an abuse of discretion.'"  Raiche v. Pietroski, 623 F.3d 30, 41 (1st Cir. 2010) (quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987)).  "[We] may set aside a jury's verdict and order a new trial only if the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice."  Id. (alteration in original) (quoting Sanchez v. P.R. Oil Co., 37 F.3d 712, 717 (1st Cir. 1994)).  After reviewing the relevant facts and procedural history, we then explain why we conclude that Tourangeau has not shown that this demanding standard has been met here.

### 1.

### a.

The EPA provides, in relevant part, that:

> [n]o employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less

- 24 -

than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1). The EPA recognizes an exception, however, "where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." Id. The EPA further provides that employers "shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee." Id.

At trial, Tourangeau sought to prove that Nappi had violated the EPA by paying her wages "at a rate less than the rate at which [it] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions," id. To that end, Tourangeau presented evidence that Nappi had made a decision based on her sex in not compensating her with a three-percent commission on her sales.

Specifically, Tourangeau presented evidence that at the time that she was hired in 2014 to be a wine sales representative -- with a start date in January of 2015 -- she was the first female the company had hired for such a position. She presented evidence that showed, among other things, how she was

- 25 -

compensated relative to other wine sales representatives at Nappi. In that regard she showed that her "offer of employment included a 2% commission and a base salary that would equate to the other 1% commission due to the seasonal nature of her business," and that all other "sales representatives in the Wine Department were paid 3% commission." Tourangeau further presented evidence that Nappi's former wine sales director Paul Carr had offered the position for which Tourangeau was ultimately hired "to a male sales representative at 3%." Tourangeau also presented evidence that, nearly four years later, Carr's successor Matt Watson informed Tourangeau that starting in 2019 "her one[-]percent salary would be eliminated" and she would only receive the two-percent commission.

**b.**

In rendering a verdict in favor of Nappi on this EPA claim, the jury completed a special verdict form. The form indicated that the jury found that Tourangeau had "proven, by a preponderance of the evidence, that Defendant Nappi Distributors paid her less than at least one male wine sales representative engaged in work requiring substantially equal skill, effort, and responsibility and performed under similar working conditions." The form also indicated, however, that the jury found that Nappi had "proven, by a preponderance of the evidence, that the differential in pay between Ms. Tourangeau and the comparable male

- 26 -

employee(s) was due to quantity or quality of production and/or to a business decision, such as adjusting its payroll to reflect industry standards, not based on gender." Thus, the jury's verdict in favor of Nappi on this EPA claim was based on the jury having found that the company met its burden to prove that its differential in payment was based on a "factor other than sex." 29 U.S.C. § 206(d)(1).

## c.

Following the jury's verdict, Tourangeau moved for a new trial on the EPA claim on the ground that "the jury's verdict was contrary to the law and against the great weight of the evidence." The motion pointed out that "Nappi consistently cited 'grandfathering' as the basis for unequal pay in this case."

The reference to "grandfathering" concerned Nappi's contention that in 2014, for business reasons, the company had chosen to continue to pay a three-percent commission to the sales representatives in the company's wine department who had been hired before Tourangeau (all of whom were men) but to pay only a two-percent commission to any sales representatives in that department who were hired thereafter. The motion argued that Nappi's consistent reliance at trial on "grandfathering" to justify the differential in pay between Tourangeau and male wine sales representatives required the District Court to grant a new trial on this EPA claim.

- 27 -

To make that case, the motion asserted in part that "'grandfathering' is the same thing as a 'seniority system,'" and that "Nappi could not prove that [its] 'grandfathering' of male wines sales representatives was the kind of 'bona fide seniority system' the U[nited ]S[tates] Supreme Court has found to qualify as an affirmative defense under the EPA." Thus, Tourangeau's motion argued, "Nappi had the burden of proving that a 'business decision' or 'industry standards' separate and distinct from a seniority system or 'grandfathering' warranted the pay disparity here." Yet, the motion then went on to contend, Nappi had failed to carry that burden.

Tourangeau's motion concluded by asserting that the "evidence at trial simply did not support that Nappi had a legitimate reason other than sex to take Tourangeau's salary away in 2018," as the District Court had ruled at trial that "a bona fide seniority system was 'just not what happened here.'" The motion continued that "[b]ecause no other evidence was introduced by Nappi to explain the pay disparity and meet the heavy burden of proving the catchall defense under the EPA, a new trial must be granted."

After presenting this evidence and these arguments, Tourangeau's motion turned to several precedents that she contended required the District Court to grant a new trial with respect to the EPA claim in question. Specifically, the motion

- 28 -

asserted that the District Court had correctly "ruled during trial that Nappi had failed to establish a seniority system or merit-based system that would entitle it to an affirmative defense." That was so, the motion contended, because, under California Brewers Association v. Bryant, 444 U.S. 598 (1980) and "cases interpreting it," there is only a "bona fide seniority system" when certain prerequisite features about the challenged employer practice exist, and Nappi failed to demonstrate the existence of those prerequisite features. Indeed, the motion argued, "Nappi had no written agreement establishing a bona fide seniority system. Nappi never established concrete rules for when seniority accrues or how it may be forfeited. Under these circumstances, 'seniority' of any kind cannot be the basis for an affirmative defense to the unequal pay received by Tourangeau." The motion then invoked cases from outside our Circuit that the motion claimed used "seniority" and "grandfathering" interchangeably, and the motion argued on the basis of those precedents that Nappi "attempted to prove the affirmative defense of a bona fide seniority system by calling it something different: 'Grandfathering[,]'" but that the jury's acceptance of the "grandfathering" justification was "contrary to the clearly established law discussed above."

Finally, the motion argued that, "[a]side from 'grandfathering' and seniority, Nappi simply offered no evidence of a catchall business justification that warranted unequal pay."

In that regard, the motion asserted that the "evidence presented to the jury" was that "Nappi's justification for paying Tourangeau less was grandfathering," that "Nappi made nebulous, ever-changing arguments about industry standards and inflated salaries in the wine division" but that Nappi "provided no evidence of what industry standard was met by paying women less for equal work," and that "the record evidence established that Nappi's competitors were paying wines sales representatives more than 2% commission." Indeed, the motion argued, citing Odomes v. Nucare, Inc., 653 F.2d 246 (6th Cir. 1981), "Nappi had nothing but illusory, post-event, undocumented reasons for why it paid Tourangeau less."

In fact, the motion claimed, "there was testimony about wine representatives needing to do 'heaving lifting' on occasion, leading Nappi to conclude that the job was not right for a woman." And, the motion argued, analogizing Tourangeau's case to Corning Glass Works v. Brennan, 417 U.S. 188 (1974), Nappi's "implicit decision that it should reduce Tourangeau's salary until she earned only 2% commission, but that it could not or would not reduce the commission structures of 'grandfathers,'" was similar to the decision made by the employer in Corning to pay male workers higher due to the "generally higher wage level of male workers and the need to compensate them for performing what were regarded as demeaning tasks" (quoting Corning, 417 U.S. at 205). Tourangeau's motion contended in that connection that "[i]mplicit in this

- 30 -

argument is the idea that male sales representatives at Nappi would not stand for such a reduction in pay -- but Tourangeau would," as the "reason Nappi did not reduce the commission rates of grandfathers was because of a perception that, in the beverage industry job market, Nappi 'could pay women less than men for the same work.'"

The portion of the motion that challenged the evidentiary and legal basis for the jury's verdict ultimately concluded by asserting that a new trial was warranted. The motion asserted that this was so because "Nappi utterly failed to provide the jury with a precise, legitimate explanation other than 'grandfathering' for the pay disparity with Tourangeau. Nappi failed to explain the 'entirety of the pay gap.' No concrete factor other than sex existed or was proven for paying Tourangeau less than at least one male wine sales representative" (internal citation omitted).

**d.**

In rejecting these grounds for granting the motion for a new trial, the District Court made a different assessment of the evidence regarding Nappi's explanation for the differential in pay that was at issue. Specifically, the District Court concluded as follows.

First, the District Court determined that "[t]he record at trial established that all new wine sales representatives hired

by Nappi since 2014 -- regardless of their sex -- have been compensated at a two-percent commission rate." Tourangeau, 2023 WL 4597031, at *10. Moreover, the District Court determined, "Nappi presented evidence to the jury showing that the move to a two-percent commission rate for new wine sales representatives was part of an effort to 'cap' the amount Nappi was paying its wine sales representatives," and, "[a]ccording to Nappi, such a move was intended to bring the overall compensation in the wine department down over time to a 'realistic' level as compared to compensation within Nappi and within the beverage industry." Id. The District Court concluded as well that "Nappi further presented evidence that it decided to go to a two-percent commission rate for new wine sales representatives before Ms. Tourangeau applied for a position at Nappi." Id.

Second, the District Court noted that the "jury similarly heard that the compensation Nappi paid its wine sales representatives stood out as inflated when compared to distributors both in the Northeast and nationally." Id. The District Court concluded that, while Tourangeau argued that Nappi's competitors were paying more than two-percent commissions, she "provide[d] no evidence or citation to the record" to support this allegation. Id. The District Court also concluded:

> that based on the trial testimony, a
> reasonable jury could find that Nappi's desire
> to bring its wine sales compensation more in

- 32 -

line with the company's own compensation structure and the industry as a whole is a valid business reason other than sex for the new commission rate that Nappi applied equally to all new wine sales representatives hired since 2014.

Id.

Third, the District Court pointed out that Nappi had "presented evidence that the reduction of the wine sales commissions to two percent helped to offset increased costs for fuel, energy, product, shipping, technology, and additional support staff." Id. Moreover, the District Court explained that "the jury heard from Nappi's president, Frank Nappi, Jr. -- the person who made the decision to move to two-percent commissions -- that continuing with three-percent commissions for wine sales representatives was not feasible from a business perspective." Id.

Finally, the District Court highlighted the fact that the jury "also heard evidence that Nappi's decision to keep the wine sales representatives who were with the company prior to 2014 at a three-percent commission rate was based on business reasons unrelated to sex." Id. at *11. Specifically, the District Court emphasized, "the jury heard that wine sales representatives were kept at three-percent commissions when the new rate was adopted because of their established positions and tenure at Nappi, their general experience in wine sales, and their existing role in driving sales for Nappi." Id. Indeed, company officials had

- 33 -

testified that the "grandfathers" had developed important sales relationships and that the company did not want to risk losing those employees.  See id.

The District Court ultimately concluded that there was no merit to Tourangeau's arguments for granting the new trial as to the EPA claim at issue on the ground that the jury's verdict was against the great weight of the evidence and contrary to law. As the District Court put it: "Based on the extensive record from the five-day trial, . . . the jury had a sufficient basis to find that Nappi's decision to move to a two-percent commission rate at the time it hired Ms. Tourangeau in 2014 was motivated by a business decision unrelated to sex."  Id.

## 2.

We begin with Tourangeau's principal argument on appeal. She contends the record plainly shows that Nappi failed to meet its burden to prove that she was paid less than her male counterparts based on a "factor other than sex" because the only basis Nappi gave for the decision to pay her differently was Nappi's decision to "grandfather" into a three-percent commission rate those wine sales representatives who had started working at the company before 2015.  Tourangeau contends that Nappi's practice of "grandfathering" could constitute a "factor other than sex" -- and so serve as the basis for an affirmative defense to the EPA claim -- only if the "grandfathering" constituted a

"seniority system" within the meaning of 29 U.S.C. § 206(d)(1). But Tourangeau argues that Nappi could not prove that its "grandfathering" did constitute a "seniority system" and thus that the evidence regarding "grandfathering" does not support the jury's conclusion that the differential payment to Tourangeau was based on a "factor other than sex" because "[u]nder these circumstances, 'seniority' of any kind cannot be the basis for an affirmative defense."

Tourangeau reasons that to satisfy the "seniority system" ground for deeming a pay differential "based on a factor other than sex" a company must have had in place a "seniority system" that meets certain criteria. Specifically, she contends, based on California Brewers, which construed the term "bona fide seniority system" in Title VII, that, to qualify as a "seniority system" for purposes of the EPA, the employer's method for determining the payment alleged to have violated the EPA must be spelled out in rules that: "delineate how and when the seniority timeclock begins ticking;" "specify how and when a particular person's seniority may be forfeited;" "define which passages of time will 'count' towards the accrual of seniority;" and "particularize the types of employment conditions that will be governed or influenced by seniority."

From this premise, Tourangeau contends that it follows that the EPA, as a matter of law, precludes an employer from

showing a differential payment was made pursuant to a "differential based on any other factor other than sex," if the differential is based merely on "seniority" rather than "a seniority system." That is so, she contends, because by expressly referring to a "seniority system" in setting forth the grounds for deeming a differential payment to be based on a "factor other than sex" the EPA precludes an employer from claiming that "seniority of any kind" is likewise a "factor other than sex."

It is not clear that Tourangeau is right that a "seniority system" must have the prerequisites in place that she identifies. Cf. Allen v. Prince George's Cnty., 737 F.2d 1299, 1302 (4th Cir. 1984) (holding that a hiring rule that gave preference to internal candidates over external ones was a "seniority system" under Title VII, based on the Supreme Court's construction of that term in California Brewers, because the system "effectively grants 'seniority' to all current employees, regardless of race or sex," and so "does accord preferential treatment on the basis of 'some measure' of time employed -- in fact, on the basis of any time in the [employer's] employ" (quotation omitted)).[5] But even if she is, she still fails to

_____

[5] Tourangeau argues in her reply brief that, in addition to California Brewers, two other non-EPA precedents -- Altman v. AT&T Techs., Inc., 870 F.2d 386 (7th Cir. 1989) (Title VII), and EEOC v. Ceres Terminals, Inc., No. 99-5320, 2000 WL 1726693 (N.D. Ill. Sept. 27, 2000) (Age Discrimination in Employment Act of

explain why it would follow that a differential payment made pursuant to "seniority" but not a "seniority system" could not constitute a payment made pursuant to a "factor other than sex" under the EPA.

To be sure, Tourangeau points to authority that indicates that EPA defenses must be construed narrowly. See Ryduchowski v. Port Auth. of N.Y. & N.J., 203 F.3d 135, 143 (2d Cir. 2000). She also asserts in conclusory fashion that "'seniority' of any kind cannot be the basis for an affirmative defense to the unequal pay received by Tourangeau." But that latter contention is not self-evident, given that the EPA provides that an employer is not liable for differential payments made pursuant to not only a "seniority system" but also "any other factor based on a factor other than sex." Thus, Tourangeau needs to explain why -- given the text, purpose, or structure of the EPA -- a differential payment made pursuant to "seniority" but not a "seniority system" -- if the "seniority" ground for the differential is not itself shown to have been based on sex -- cannot be a differential made pursuant to a "factor other

1967) -- "stand in stark contrast to Nappi's suggestion that unequal pay decisions can be based on 'seniority and tenure' in a colloquial sense that is any different from a 'bona fide seniority system.'" But those two other cases address no more than what California Brewers addressed, namely whether the employment practices at issue in those cases constituted a "bona fide seniority system."

than sex" just because it pertains to "seniority" and was not made pursuant to a "seniority system."  Tourangeau has not done so. See Zannino, 895 F.2d at 17.

We emphasize that this gap in Tourangeau's argument is not filled by her invocation of cases that, outside the EPA context, arguably use the terms "grandfathering" and "seniority" interchangeably.  See, e.g., Frech v. Pensacola S.S. Ass'n, 903 F.2d 1471, 1473 (11th Cir. 1990).  Those cases may show that a pay differential based on "grandfathering" is one based on seniority but not a seniority system.  But they fail to provide any support for what Tourangeau needs to show -- that grandfathering, insofar as it does not constitute a "seniority system" and is merely a "seniority" based factor, cannot be a "factor other than sex" under the EPA's catchall defense just because it concerns seniority but does not qualify as a "seniority system."

Tourangeau does argue in her reply brief that we must read the express reference to "seniority system" in the EPA to preclude an employer from mounting an affirmative defense based on a differential payment that is made pursuant to "seniority of any kind" because we generally presume that "Congress intended all words and provisions contained within a statute to have meaning and effect."  United States v. Ahlers, 305 F.3d 54, 58 (1st Cir. 2002).  She contends that "[i]f an informal or colloquial use of the term 'seniority' were proper under the EPA's 'other business

justification' catchall affirmative defense, there would be no need to separately articulate a 'bona fide seniority system' in the statute."

Tourangeau makes this contention on appeal for the first time in her reply brief. United States v. Vanvliet, 542 F.3d 259, 265 n.3 (1st Cir. 2008) ("Arguments raised for the first time in a reply brief are waived."). But, in any event, Tourangeau fails to develop an argument for why the EPA's reference to a "seniority system" was meant to preclude the separate catchall provision from encompassing, among other things, seniority-related (but not seniority-system-based) factors that were not themselves proven to have been sex-based rather than merely to make clear that such a system could ground an employer's affirmative defense under the EPA. See Mass. Ass'n of HMOs v. Ruthardt, 194 F.3d 176, 181 (1st Cir. 1999) ("[A] list of examples is not necessarily superfluous -- Congress may consider a specific point important or uncertain enough to justify a modicum of redundancy . . . ."); Joffe v. Google, Inc., 746 F.3d 920, 926 (9th Cir. 2013) ("Congress 'sometimes drafts provisions that appear duplicative of others . . . to clarify what might be doubtful -- that the mentioned item is covered.'" (quoting Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 132 F.3d 775, 782 (D.C. Cir. 1998))); see also 109 Cong. Rec. 9203 (statement of Rep. Griffin) ("Roman numeral iv

[of § 206(d)(1)] is a broad principle and those preceding it are really examples.").

3.

Tourangeau does contend in the alternative that, on this record, "no reasonable jury could have found that something other than gender was the actual motivation for paying Tourangeau less." In doing so, she contends that the "grandfathering"-based reason for the pay differential was in fact pretextual.

Tourangeau relies in part on the fact that, as she sees it, the record shows that Nappi did not "abide[]" by the grandfathering line it drew. Here, she emphasizes the evidence that shows that when she was hired, she received what was effectively a three-percent commission rate even though she began working for Nappi after the "grandfathering" cutoff date.

The record contains substantial evidence, however, that Nappi did apply the two-percent-commission rule to Tourangeau. Although her additional salary might have initially amounted to the difference between a two-percent and a three-percent commission, Nappi provided evidence that the company intended from the start of her employment that a two-percent commission would "cap" her total compensation over time. We note, too, that Tourangeau does not dispute the evidence in the record that shows that Nappi paid a two-percent-commission compensation to all five male and female wine sales representatives who began working at

- 40 -

Nappi after 2014 other than Tourangeau and employee Dan Toolan, who also received a salary in addition to a two-percent commission. Thus, in pressing this pretext-based argument, Tourangeau fails to show that the jury's verdict was against the "demonstrable weight of the credible evidence," Raiche, 623 F.3d at 41 (quoting Sanchez, 37 F.3d at 717).

Tourangeau additionally argues that the record shows that the "grandfathering" explanation was pretextual because, before she had been hired, Nappi had offered a three-percent commission to a male job candidate for the role for which she was eventually hired. But here again we are not persuaded.

Contrary to Tourangeau's contention, the undisputed record shows that Nappi's former wine sales director Paul Carr, who had offered the job to the male candidate, was not actually authorized to offer a three-percent commission. Rather, Carr testified that his superior was "livid and he asked me if I liked my job, so after 25 years he threatened to fire me."

Tourangeau's next pretext-based argument depends on the contention that the record lacks evidentiary support for Nappi's asserted reasons for instituting the "grandfathering." She argues here that, because the record did not contain evidence of what Nappi's competitors were paying and in fact showed that Nappi's competitors were paying some wine sales representatives a more than two-percent commission, there could be no "business

justification" for paying a two-percent as opposed to three-percent commission.

However, as Nappi points out on appeal, one Nappi official "explained at trial that Nappi's compensation for wine salespeople stood out as inflated compared to distributors both in the northeast and nationally." Moreover, in so testifying, that official cited to a report that "Tourangeau had sent to Wine Sales Director Matt Watson, which contained survey information that supported and validated what Nappi was doing with regard to reducing compensation of wine sales representatives." And, as Nappi also points out, there were numerous other business-based reasons to implement the "grandfathering," including a desire to retain employees who had developed important sales relationships.

**4.**

To the extent that, claims of pretext aside, Tourangeau is arguing that the jury's verdict was against the great weight of the evidence because the record shows that Nappi implemented its "grandfathering" based on its belief that "male sales representatives at Nappi would not stand for such a reduction in pay -- but Tourangeau would," we also cannot agree. The record does show that Nappi managers were concerned about the retention of wine sales representatives who had been hired before 2015 -- and who were all men. But the record also shows that employees hired before 2015 had "develop[ed] relationships" with clients that

Nappi wanted to retain. Yet Tourangeau does not point to anything in the record that indicates -- let alone shows by the great weight of the evidence -- that Nappi believed that retaining those relationships was worth more than retaining the relationships that Tourangeau had developed with her clients because men had been the ones who had developed them. Nor does she point to any legal authority that holds that an employer's decision to reduce salaries on a going-forward basis for all new hires, when all existing employees are men, is necessarily a decision based on sex. See Zannino, 895 F.2d at 17.

**5.**

Tourangeau also appears to be arguing that Nappi's decision in 2019 to remove Tourangeau's salary shows that the "grandfathering" was not based on a business decision. Her contention appears to be that the reduction in her pay at that time occurred so long after the claimed business necessity for the "grandfathering" that a jury could not credit Nappi's contention that there was a business justification for the "grandfathering."

This contention necessarily rests on the premise that either she herself was effectively grandfathered along with the others in 2015 or that no one was grandfathered until her salary was reduced in 2019. Tourangeau fails to show, however, that it was against the great weight of the evidence for the jury to find

that, prior to 2015, Nappi had decided to stop paying a three-percent commission to new wine sales representatives.

To that point, there is substantial support in the record for finding that Nappi, at the time that it hired Tourangeau, categorized Tourangeau as one of the sales representatives who, based on that decision, would not receive a three-percent commission. Indeed, as Nappi argues on appeal, Nappi paid Tourangeau a salary on top of her two-percent commission merely to "offset the then-more seasonality of her route and to allow her to develop and establish relationships within her route."[6]

**6.**

Finally, Tourangeau may mean to be contending that, even if the "grandfathering" provided a non-sex-based reason for denying her the three-percent commission in 2015, the decision to nonetheless reduce her salary in 2019 was itself sex-based and so

---

[6] Tourangeau does also argue, for the first time on appeal, that the record shows that there was another wine sales representative (Dan Toolan) with a southern route such as hers who received more than a two-percent commission despite having been hired after 2015. However, it is not until her reply brief that she develops an argument that the other employee's receipt of a salary plus the two-percent commission showed that the "evidence was contrary to Nappi's insistence that it drew a line of grandfathers in 2014 and abided by it." See Vanvliet, 542 F.3d at 265 n.3 ("Arguments raised for the first time in a reply brief are waived."). In any event, as even Tourangeau concedes, that employee simply received a two-percent commission and also an additional salary just like Tourangeau did, so that employee's receipt of the additional salary does not disprove that Nappi had decided in 2014 to implement the "grandfathering."

for that reason violative of the EPA.  But, even accepting that such a contention implicates the EPA, we do not see how the great weight of the evidence goes against the jury's verdict for Nappi on the EPA claim at hand.

As Nappi points out on appeal, the record included testimony from Nappi officials that the company reduced Tourangeau's salary when it did based on its decision in late 2018 to implement re-routing and re-assignment of sales accounts to "tighten up geographies."  In fact, one Nappi official testified that doing so had the "effect of lowering some of the compensation" for wine sales representatives beyond Tourangeau.  The record also shows that, as part of that rerouting and restructuring process, Nappi decided to eliminate salaries from the only two wine sales representatives with southern routes who had salaries (including Tourangeau) for the sake of "tighten[ing] up the way the compensation was done to make it consistent," as "there w[ere] no other salaries being paid."[7]

---

[7] Tourangeau does also argue for the first time on appeal that Nappi's decision in 2019 to remove that other employee's salary was made specifically to "avoid a claim of sex-based discrimination" as to Tourangeau, which she contends is itself a violation of the EPA.  But she forfeited this argument by not raising it in her motion for a new trial and has not made any argument that it was plain error for the District Court to have denied her motion for a new trial on this basis.  Accordingly, we deem that argument waived.

**7.**

For all these reasons, we conclude that Tourangeau has not shown how the District Court's findings were "so clearly against the law or the evidence, as to constitute a miscarriage of justice." Rinsky v. Cushman & Wakefield, Inc., 918 F.3d 8, 27 (1st Cir. 2019) (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 558 (1st Cir. 1989)). We must, therefore, reject Tourangeau's challenge to the District Court's denial of her motion for a new trial on the EPA claim insofar as the denial concerns the portion of the motion that challenged the sufficiency of the evidence underlying the jury's verdict.

**B.**

Tourangeau's remaining challenge to the District Court's denial of her motion for a new trial concerns the District Court's denial of her request to provide the jury with an instruction based on Corning. The proposed instruction reads as follows:

> If you find that Nappi has proven its defense and that the decision to pay Ms. Tourangeau was based on a neutral factor other than sex[,] but [that] it nevertheless operated to perpetuate the effects of the company's prior illegal practice [of] not hiring women for the sales representative positions, [then] you must find in Ms. Tourangeau's favor.

The District Court rejected this contention because it found that:

> although Nappi chose to lower its commission rate . . . at the same time it hired its first

- 46 -

female wine sales representative, there is no 'prior illegal practice,' as [there was] in <u>Corning</u>. Employing only male wine sales representatives prior to Ms. Tourangeau is not an illegal practice in and of itself that permits the Court to adopt Ms. Tourangeau's proposed <u>Corning</u> instruction.

<u>Tourangeau</u>, 2023 WL 4597031, at *19 (citing <u>Corning</u>, 417 U.S. at 209-10). The District Court then concluded that "the instructions in their totality, as presented to the jury, adequately informed the jury as to the controlling issues in Ms. Tourangeau's EPA claim." <u>Id.</u> at *20.

We review de novo the District Court's refusal at trial to give Tourangeau's requested instruction. <u>Mejías-Aguayo</u> v. <u>Doreste-Rodríguez</u>, 863 F.3d 50, 57 (1st Cir. 2017). Such a refusal "is only reversible error if: 'the requested instruction was (1) correct as a matter of substantive law, (2) not substantially incorporated into the charge as rendered, and (3) integral to an important point in the case.'" <u>Id.</u> (quoting <u>Cigna Ins. Co.</u> v. <u>Oy Saunatec, Ltd.</u>, 241 F.3d 1, 8 (1st Cir. 2001)). Moreover, Tourangeau "must show that the assigned error affected substantial rights, or, in other words, that the error was not harmless pursuant to [Federal Rule of Civil Procedure] 61." <u>Cigna Ins. Co.</u>, 224 F.3d at 8 (cleaned up).

On appeal, Tourangeau first contends that, "[i]f all the employees who were previously paid in a more favorable manner were men because of discriminatory hiring practices, then the EPA's

direct purpose is advanced by giving the instruction at issue in Corning." But she has not pointed to anything in the record that shows there was a prior "discriminatory hiring practice" at Nappi. It is of course undisputed that, before hiring Tourangeau, Nappi only employed male wine sales representatives. However, as the District Court noted, Tourangeau did not attempt to use this fact to prove that Nappi used a discriminatory practice that violated the EPA like the employer did in Corning. Thus, she has not shown how the instruction would have been "integral to an important point in the case." Mejías-Aguayo, 863 F.3d at 57.

Tourangeau next contends that the instruction had to have been given both because Nappi had a "pay or wage structure in place prior to Tourangeau's hiring" that "applied to all men because Nappi discriminated against women in its hiring practices," and that Nappi's "prior practices of not hiring any women for the job were 'baked in' to the disparity alleged." However, because Tourangeau did not establish that Nappi previously discriminated against women in its hiring practices, this argument fails for the same reason her first contention does.

Finally, Tourangeau contends that the District Court erred in not giving the instruction because, as in Corning, the higher-paying work in her case was "performed solely by men." Corning, 417 U.S. at 204. But, as the District Court pointed out, the requested instruction's plain terms show that it was predicated

on there being a basis in the record for finding that Nappi had previously illegally discriminated against women in its hiring practices.  Thus, because we agree with the District Court's determination that the record contains no such basis, we do not see why it matters, as Tourangeau contends on appeal, either that "Corning does not explicitly require a prior illegal pay practice to be 'baked into' a current EPA violation" or that the "Corning jury instruction does not apply only to perpetuation of unequal pay within the same workplace, but within our society as a whole." Either way, we still would have no basis for concluding that a new trial was warranted based on the District Court having failed to give the requested instruction even if each of these propositions were correct.

## IV.

The District Court's judgment is **affirmed**.